# RANKIN *v.* CHASE NATIONAL BANK.

ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 105.    Argued December 3, 4, 1902.—Decided February 23, 1903.

The cashier of a bank in Elmira owing individually to the New York correspondent bank $15,012.50 tendered $8000 in currency and a draft for $7000 made to himself by himself as cashier on a Philadelphia bank with which the Elmira bank had funds.   The New York bank declined to accept the draft on Philadelphia on account of risk and delay in collection and demanded funds current in New York.   Thereupon the cashier drew his own check on the Elmira bank for the entire amount and certified it himself as cashier making it payable at the New York bank with which the Elmira bank had sufficient balance to pay the same without the $7000 draft.   The New York bank accepted this check in payment of the debt and charged it to the Elmira bank's account.   At the same time it credited that bank with the $8000 currency and took from the cashier the $7000 draft which was then made payable to himself as cashier, and after the proceeds had been collected credited the Elmira bank with them also. It subsequently developed that the cashier had no balance to his individual account in the Elmira bank and that he had stolen from it the $8000 of currency.   In the court below it was found as fact that there was no evidence of bad faith on the part of the New York bank in the transaction and it was also found that there was no evidence to justify any departure from the rule that a person accepting the check of a cashier certified by himself and in payment of an individual debt does so at his peril and

without recourse against the bank in case the cashier does not actually have the funds on deposit wherewith to meet the check.

In regard to the contention of the New York bank that it was entitled either to charge the $15,012.50 check against the Elmira bank or to retain both the $8000 in currency and the proceeds of the $7000 draft, in payment of the debt, it was *held* :—

(1) That as no exception was saved as to the rulings of the court below in regard to the illegality of the $15,012.50 check that question is not open to controversy in this court.

(2) As to the $8000 currency that the New York bank was entitled to retain the same as one who has in good faith and in payment of an existing debt received currency, cannot be compelled to repay the same even though it subsequently develops that it had been embezzled, and the burden of showing fraud is on the person claiming the repayment.

(3) As to the $7000 draft that the New York bank could not retain the proceeds thereof as it was simply an order transferring funds belonging to the Elmira bank from the Philadelphia bank to the New York bank and could not be used in payment of an individual debt due from the cashier which had, prior to the collection of such proceeds, actually been paid by the charging up of the $15,012.50 check.

On the 23d day of May, 1893, the Elmira National Bank of Elmira, New York, failed, and a receiver was shortly thereafter appointed. At the date of the failure, on the face of the ledger of the Chase National Bank of New York city, there was a balance to the credit of the Elmira bank which was paid with interest at six per cent, as previously agreed on. The receiver, at the time of this payment, asserted that he was entitled to a larger sum. This being disputed by the Chase bank, the present suit was brought. In substance the cause of action was based upon the averment that the Chase bank had wrongfully charged the account of the Elmira bank with a check for $15,012.50. The answer, whilst admitting the charging of the check, asserted its validity. In addition it was averred that, even although the check had not been legally charged, the Elmira bank was not entitled to recover, because at the time the check was debited to its account, and as a result of such charge two credit items, one of $8000 and the other of $7000, had been put to the account of the Elmira bank, to which it otherwise would not have been entitled, and

hence the check had been counterbalanced by the credits in question. There was verdict and judgment in favor of the Chase bank, and the case was taken by the Elmira bank to the Circuit Court of Appeals. That court decided that the trial court had correctly instructed the jury that the check for $15,012.50 was void, and therefore had been illegally debited to the Elmira bank. The court, moreover, held that the court below was right in instructing that the two credit items, referred to in the answer, could be retained by the Chase bank if the sum thereof belonged to that bank, which had given credit to Elmira for the amount, solely as a counter entry to the charge of the check for $15,012.50. The judgment was, however, reversed, and a new trial ordered, because it was concluded there was no proof from which the jury could have inferred that the Chase bank had a right to retain the $7000 item. 104 Fed. Rep. 214. On the new trial the case made was as follows :

J. J. Bush, who was the cashier of the Elmira bank, borrowed for his individual account from the Chase bank a sum of money, and his debt, evidenced by his demand note, secured by stock of the Elmira bank as collateral, amounted, on the 4th of May, 1893, in principal and interest, to a sum slightly exceeding fifteen thousand dollars. On that day Porter, the vice president of the Chase bank, through the long distance telephone, called Bush at Elmira, and requested that he either pay his debt or furnish additional security. Bush replied that he would come to New York city on the next morning and settle the matter. On the morning of the 5th of May he appeared at the office of the Chase bank and offered to Porter, the vice president, $8000 in cash and a draft for $7000, signed by Bush as cashier of the Elmira bank, drawn on the Quaker City National Bank of Philadelphia. The vice president stated to Bush that the draft on Philadelphia was not equivalent to cash, because of the disturbed financial condition prevailing in Philadelphia, and hence declined to receive the draft in payment of the note. It was thereupon agreed that Bush would give his individual check on the Elmira bank for the principal and interest of his debt ; that this check should be by him certified and made payable at the

Chase bank; that the cash offered should be received, and that the check and cash should be at once put, respectively, to the debit and credit of the account of the Elmira bank. It was also understood that the draft on Philadelphia should be taken, and when collected its proceeds should be credited to the Elmira account. Thereupon a check was drawn by Bush individually on the Elmira bank. Across the face of this check the following was written:

"Certified and accepted May 5, 1893. Payable at Chase National Bank, New York.

"ELMIRA NATIONAL BANK,
"By J. J. Bush, *Cashier*."

There was conflict in the testimony as to whether the $7000 draft on Philadelphia, signed by Bush as cashier, was when first offered by him, payable to his individual order or to his order as cashier. The officer of the Chase bank testified that when the draft was first offered it was payable to Bush's individual order, and that it was subsequently changed so as to make it payable to the order of Bush as cashier, to carry out the settlement agreed upon. There was no conflict, however, in the proof, showing that the draft on Philadelphia, as actually handed to the Chase bank, was drawn by Bush as cashier of the Elmira bank to his own order as such cashier, and was endorsed by him as cashier for deposit in the Chase bank. The $8000 in cash, having been received from Bush, was at once credited to the account of the Elmira bank, and also at once the account of that bank was debited with Bush's individual and certified check for the $15,012.50. As the account of the Elmira bank had to its credit a sum more than sufficient to pay the check, it resulted, upon the assumption of the legality and good faith of the Chase bank in charging the check, that it at once received the full amount of the debt due it by Bush. The draft on Philadelphia was forwarded for collection and was thereafter paid, and the proceeds put to the credit of the account of the Elmira bank. It was shown that on the 5th of May, when Bush drew and certified his individual check on the Elmira bank for $15,012.50, his deposit account with that bank

was overdrawn. It was shown that at various times, covering a considerable period, Bush had drawn as cashier of the Elmira bank a number of checks for a small amount, each to his individual order, and had used such checks to pay his personal debts, and there was also proof tending to show that the officers and directors of the Elmira bank knew, or had reason to know, that such checks had been drawn by the cashier. Other checks were also offered, from which it was contended the inference of implied authority could be legitimately drawn. It was shown that the Elmira bank had no knowledge of the drawing of the check of $15,012.50, and the fact that such check had been charged by the Chase bank to its account was only learned after the failure of the Elmira bank, when the Chase bank rendered its account to the receiver. It was also shown that Bush, the cashier, had, on the evening of the 4th or the morning of the 5th of May taken the $8000 of cash which he paid to the Chase bank from the funds of the Elmira bank.

The court instructed the jury that the check for $15,012.50 was void as to the Elmira bank, "because it was the certification of the cashier's individual check, given and received for his individual benefit, with no authority either to certify or to make it payable elsewhere than at the office of the Elmira National Bank. . . . There is no evidence tending to show that Bush had any real or apparent authority for this certification or to make the check payable at the office of the defendant. . . . The certification by a cashier of his own individual check is void, irrespective of the question whether he had funds in the bank to meet it, for he could not act in regard to the same check in two capacities, both as drawer and as endorser, to bind the bank for its payment."

To this instruction of the court no exception was reserved by the defendant. Having thus eliminated the check of $15,012.50 from the account, the court said:

" The importance of this case turns upon another set of facts, to which I will now call your attention. You will see that Bush, as cashier, certified his own individual check for $15,012.50, and that he left the c irrency, $8000, and the Quaker City draft for $7000. Consequently, whatever is to be found about the

liability of the defendant to repay $15,000, there is no question that it is liable to repay $12.50 and interest from May 5, 1893, and your verdict will be for the plaintiff for that sum at least."

To this charge also no exception was reserved by the defendant. The court then proceeded:

" The questions in the case beyond the $12.50 are in regard to the right of the Chase National Bank to retain the $8000 in currency and the $7000 draft. You will see that, with the exception of this $12.50, I put the case as though when Bush came in with his bag containing $8000 in currency and $7000 in a draft, those two, the currency and the draft, had been received by Porter and credited upon the note, and this form, this illegal, improper form of taking Bush's individual check and having it certified by himself as cashier, had not been gone into. The questions in the case beyond the $12.50 are in regard to the right of the Chase National Bank to retain the $8000 in currency and the $7000 draft. Now, this money, this currency, was without question taken by Bush from the vaults of the Elmira bank without authority, and was its property, but inasmuch as it was currency or money, bank bills, if it was received by the defendant in good faith, in due course of business and for the payment of a valid debt, the defendant is not subjected to the risk of repayment to the person from whom it was illegally obtained."

Coming to consider the draft for $7000, the court first called the attention of the jury to the fact that there was some dispute in the testimony as to whether this draft, when originally offered by Bush to the Chase bank in part payment of his debt, was drawn to his individual order or to his order as cashier, but expressed an opinion that it was satisfactorily established by the testimony adduced by the Chase bank that the draft, when first offered to that bank, was drawn to Bush's individual order, and that the adding of the word cashier after the name of Bush, so as to make it payable to him as cashier, was subsequently done, and that such also was the case as to the endorsement on the draft making it payable for deposit in the Chase National Bank to the credit of Bush, cashier, that is, of the Elmira bank. The court, however, instructed the jury that in

any event the addition of the word cashier upon the face of the draft and the endorsement put upon it was of no importance except as a mere element of proof on the subject of the good faith of the Chase bank in having received the money and draft from Bush. Thus treating the fact that the draft was signed by Bush as cashier, and was payable to his order as cashier for deposit in the Chase bank to the credit of the Elmira bank, as irrelevant, except on the question of good faith, the court came to consider whether the Chase bank was entitled to retain the proceeds of the draft. The jury were instructed that " in the absence of any authority in the cashier to draw cashier's drafts to his own order in payment of his individual debts, the person who receives such a draft in payment of a cashier's individual debt takes the risk of being obliged to pay the draft to the bank. . . . The general authority of the cashier to draw drafts or checks on the bank in the conduct of its business does not, by itself, permit him to draw such drafts or checks in payment of his personal debts or to raise money for the transaction of his personal business. When, therefore, he draws a draft or a check on the bank payable to his own order, and for his own individual debt, the party acting thereon takes the risk that he may act without authority to do so."

The jury, however, were instructed that either express or implied authority might have been conferred to draw such drafts, but that, as there was no proof tending to show express authority, it could only be found by implication. The source from which such implication might be derived from the proof before it was stated to the jury as follows :

" The authority of a cashier may be inferred from the general manner in which, for a period sufficiently long to establish a settled course of business, he has been allowed, without interference, to conduct the affairs of the bank. It may be implied from the conduct or acquiescence of a corporation as represented by its board of directors. When during a series of years and in numerous business transactions he has been permitted without objection, and in his official capacity, to pursue a particular course of conduct, it may be presumed, as between his bank and those who in good faith deal with it upon the basis

of his authority to represent the corporation, that he has acted in conformity with instructions received from those who have the right to control its operation. His authority is to be implied from the acquiescence of the directors in permitting an officer, during a series of years, to pursue a particular course of conduct, and this acquiescence is derived from their actual knowledge, or from what should have been their knowledge of the conduct, of the course of business of the officers."

Commenting at length upon the testimony showing the drawing of checks by Bush as cashier to his individual order, and pointing out the fact that the proof on the subject was different and stronger than had been the proof in the case when previously tried, the question of fact as to the existence of the course of business authorizing the inference of authority in Bush, was submitted to the jury. Exceptions were reserved by the receiver to the foregoing rulings, as well as to the refusal of the court to give instructions which were asked, embodying asserted principles of law which were directly antagonistic to those charged by the court to the jury. There was verdict and judgment against the Chase bank for $12.50 with interest, and the case was taken again to the Circuit Court of Appeals. That court, considering that all the legal controversies in the case had been settled by its previous opinion, and that the additional evidence on the subject of course of business was sufficient to support the verdict as to the proceeds of the draft for $7000, affirmed the judgment, for the reasons just mentioned, which were stated in a *per curiam* opinion.

*Mr. Edward B. Whitney* for plaintiff in error.

*Mr. Thomas Thacher* for defendant in error. *Mr. Alfred B. Thacher* was on the brief.

Mr. Justice White, after making the foregoing statement, delivered the opinion of the court.

1st. The illegality of the check for $15,012.50 and the wrong resulting from charging it to the account of the Elmira bank is not open to controversy. The ruling to that effect on the first

trial seems to have been acquiesced in by the Chase bank, since it prosecuted no writ of error, and this is also true of the case now before us. Besides, no exception was saved by the Chase bank at the trial now under review to the instruction of the court concerning the illegality of the check and its insufficiency as a charge against the funds of the Elmira bank on deposit with the Chase bank. That question may be therefore put out of view.

2d. The errors assigned by the receiver of the Elmira bank concerning the right of the Chase bank to retain the $8000 paid it in cash are also in substance not open to inquiry because of the verdict of the jury. Whether the $8000 in currency was actually received by the Chase bank from Bush in good faith in part payment of his note was left by the court to the jury under adequate instructions, and these issues of fact are therefore foreclosed by the verdict in favor of the Chase bank. It follows that the $8000 when deposited was the money of the Chase bank, received by it in part payment of a debt. This leaves open only the question whether one, who has in good faith received currency in payment of an existing debt, can be compelled to repay such currency because it subsequently develops that the currency paid had been embezzled by the one who made the payment. That under such conditions repayment cannot be exacted is elementary and is not disputed. It is equally clear, we think, that the court correctly charged the jury that the burden of showing fraud on the part of the Chase bank was on the receiver.

3d. Conceding, without so deciding, the correctness of the ruling of the court below as to the right to imply authority on the part of the cashier to draw a draft in his official capacity in his individual favor from the course of previous business, we fail to perceive its relevancy to the case before us. The draft for $7000, which was collected by the Chase bank, was not drawn by the cashier to his individual order, but was drawn by him as cashier to his order as cashier, and was endorsed for deposit to his credit as cashier. It was therefore but an order transferring the funds of the Elmira bank, which were on deposit in the Philadelphia bank, to the deposit account of the El-

mira bank with the Chase bank. True it is that Bush, from one view of the testimony, first tendered a draft signed by himself as cashier to his individual order; but such draft was not taken by the Chase bank. It may be, if the principles of authority implied from a course of business as announced by the lower court, be sound, and if the facts brought this case within such a rule, if the Chase bank had taken the cashier's draft to his individual order, it could have retained the money. We are not however called upon to pass upon the rights of the parties upon the basis of what might have been done, but alone upon what was done. We may not indulge in conjecture, but must dispose of the case as depending upon the real, not the imaginary transaction. Measuring the rights of the parties by this rule, we see no escape from the conclusion that the money collected by the Chase bank for account of the Elmira bank was obviously the property of the latter. The draft on Philadelphia was refused because of the delay which it was feared would attend its collection. The certified check was taken. It was for the entire debt, principal and interest. It was at once charged. The sum to the credit of the account of the Elmira bank when the check was charged was more than sufficient to pay it. Upon the theory of the good faith of the transaction, on the part of the Chase bank, its, debt was paid, and it could have no possible interest in the proceeds of the collection of the draft. Of course, on the theory that the Chase bank was suspicious of the legality of the certified check and of its right to debit the Elmira bank with it, the purpose to retain a right in the proceeds of the draft would be in reason conceivable. But to indulge in this hypothesis would be to assume the existence of bad faith, and hence to defeat the right to the proceeds of the draft and of the money as well.

It follows that there was error committed in the instructions as to the right of the Chase bank to retain the $7000 collected by it from the proceeds of the draft in favor of the Elmira bank, and

*The judgment of the Circuit Court of Appeals is therefore reversed and the case remanded to the Circuit Court with directions to set aside the verdict and grant a new trial.*