No. 20,242.

RALPH BENJAMIN, *Appellee,* v. THE WELDA STATE BANK, *Appellant.*

SYLLABUS BY THE COURT.

1. MONEY—*Fraudulently Obtained—Can Not be Recovered from Innocent Third Party.* Money which has been obtained by fraudulent means can not be reclaimed after its payment to one receiving it without notice of the fraud, although it is applied upon a preëxisting debt without the surrender of any security.

2. SIGHT DRAFT—*Obtained by Fraud—Proceeds Can Not be Followed into Hands of Innocent Holder.* Where one who has fraudulently obtained a check or draft delivers it to his creditor, although without endorsement, to be applied upon an existing debt, its proceeds when collected and so applied are subject to the same rule.

3. SAME—*Draft Fraudulently Obtained—Notice.* The circumstances held not such as to charge a bank with notice that a draft delivered to it had been obtained by fraud.

Appeal from Anderson district court; CHARLES A. SMART, judge. Opinion filed June 10, 1916. Reversed.

*A. E. Crane,* of Atchison, *E. D. Woodburn,* and *F. T. Woodburn,* both of Holton, for the appellant.

*J. G. Johnson,* of Garnett, for the appellee.

The opinion of the court was delivered by

MASON, J.: On March 5, 1913, W. E. Lockner, being the owner of 148 steers, executed a chattel mortgage upon them for $5200, which was properly filed for record. A week later he sold ninety-nine of them to Ralph Benjamin for $3651.73. Benjamin paid for them by giving a sight draft on a Kansas City commission company for the amount, on which was written the statement that it was "for ninety-nine head of two-year-old steers." This draft was made payable to the order of Lockner, but without being endorsed by him was handed by Benjamin to the cashier of the Welda State Bank, to which Lockner was indebted upon an overdraft—the result of its having honored the check with which he had paid for these cattle, with others. The draft was paid on the next day, by the bank receiving credit for the amount with its Kansas City correspondent, and it at once applied the proceeds in reduction of Lockner's indebtedness. Benjamin did not know of the mortgage until about the 13th of the next month, and some sixty days later he was required to pay and did pay $2849.52 to procure the release therefrom of the cattle he had purchased. Lockner was doubtless insolvent at the time of the sale. Upon proceedings begun in the latter part of April, 1913, he was within a few weeks adjudged a bankrupt. On February 16, 1915, Benjamin sued the bank for the amount he had paid the mortgagee, and recovered a judgment, from which it appeals.

1. No contention is made that the bank knew of the mortgage. The claim against it is based on the theory that, as it applied the proceeds of the draft to its claim against Lockner, parting with nothing of value, and being placed in no worse

Benjamin v. Bank.

position by reason of the transaction, its right to retain the money was no stronger than Lockner's. One who by fraudulent means has been induced to part with the ownership and possession of ordinary personal property may follow it (upon rescission of the contract by which the title passed, where that is necessary) into the hands of a third person who has obtained it without notice of the fraud, but in consideration only of a preëxisting indebtedness. (*Schulein v. Hainer*, 48 Kan. 249, 29 Pac. 171; Note, 36 L. R. A. 161.) In the case of money, however, a different rule obtains. Although procured by fraud it can not be reclaimed after it has been used to pay an existing creditor who accepted it in good faith. (*Kimmel v. Bean*, 68 Kan. 598, 75 Pac. 1118, and cases there cited; 39 Cyc. 568, 569. See, also, *Bank v. Walters*, 92 Kan. 391, 140 Pac. 864.) The reason for the distinction has been thus stated:

"It is absolutely necessary for practical business transactions that the payee of money in due course of business shall not be put upon inquiry at his peril as to the title of the payor. Money has no ear-mark. The purchaser of a chattel or a chose in action may, by inquiry, in most cases, ascertain the right of the person from whom he takes the title. But it is generally impracticable to trace the source from which the possessor of money has derived it. It would introduce great confusion into commercial dealings if the creditor who receives money in payment of a debt is subject to the risk of accounting therefor to a third person who may be able to show that the debtor obtained it from him by felony or fraud. The law wisely, from considerations of public policy and convenience, and to give security and certainty to business transactions, adjudges that the possession of money vests the title in the holder as to third persons dealing with him and receiving it in due course of business and in good faith upon a valid consideration. If the consideration is good as between the parties, it is good as to all the world." (*Stephens v. Board of Education*, 79 N. Y. 183, 187.)

2. If the draft is regarded as the property obtained in the present case the bank can not be regarded as a holder in due course under the rule applicable to negotiable instruments, not because it was not a purchaser for value, but because no endorsement was made by the payee. We think, however, the transaction should not be regarded as the purchase of the draft by the bank from Lockner, but as the use of the draft by Benjamin as a means for causing the amount due for the cattle to be paid by the commission company to Lockner,

coupled with Lockner's consent that the money should go to the bank and be applied on his debt. If Lockner had personally collected the draft and paid the resulting cash to the bank there could be no doubt of its right to retain it against Benjamin. And this is substantially what took place. Lockner in effect authorized the bank to collect the money for him and apply it on his overdraft. The draft, upon its payment, whether that was accomplished by delivering currency to the bank, or by the commission company causing the bank to be credited with the amount in some acceptable depository, ceased to have any bearing upon the matter; its function had been performed and the situation was the same as though the actual cash had changed hands. This is an action to recover the money, not the draft. Many of the cases in which the rule as to the negotiable character of money has been applied were in fact based upon payments made by check or draft. In a typical instance the court said:

"We think the question as to whether the state was a holder of the draft for value or not does not arise in this case. Murray, as county treasurer, was behind in his payment of the taxes due from Orange county to the state. In order to discharge his obligation he transmits the draft in question. The state, through its officers, receives it and presents it to the bank upon which it is drawn, and that bank pays it, and the state having received the money thereby discharges the obligation of Murray, and the taxes due from Orange county are thereby paid. The transaction is closed, and it cannot be that the drawer of the draft that has thus been paid can open up the whole matter, and claim to recover back the money which the state received in payment of the taxes due it. If the cashier, instead of sending this draft, had taken the money directly from the bank and paid the same to the state in satisfaction for the amount due for the taxes, I think no one would contend that the bank could recover it back from the state on the ground that the act of the cashier in taking the money was a fraud upon it or even a felony, and that the state had parted with no value at the time of the receipt of the money. I do not see that in this respect the case is altered by the interposition of the draft instead of the payment of the money in the first instance. The state receives in good faith (as we must assume on this point) the written direction of the claimant to a third party to pay the money to the state upon demand, and the state makes the demand accordingly, and the money is paid and the debt extinguished. The interposition of the draft makes no difference in principle after it has been paid. It is then the same as if the money had been originally paid instead of an order given for its payment. The order having been complied with and the original debt thereby satisfied,

the transaction is closed, and may not be reopened on this ground." (*G. N. Bank v. State*, 141 N. Y. 379, 384, 36 N. E. 384.)

## And in another:

"If Mills, Robeson & Smith, on receiving the check of Ferris & Kimball, had at once collected it and turned it into money, and then had paid that money to the bank in discharge of their debt to it, and the bank had accepted that payment in ignorance of the source from which the money had been derived, and had surrendered the notes and discharged their debtors' liability in entire good faith, the owner of the stolen money would have had no right of recovery against the bank. (*Justh v. Bank*, 56 N. Y. 478; *Stephens v. Board of Education*, 79 N. Y. 183.) This doctrine goes upon the ground that money has no earmark; that in general it can not be identified as chattels may be, and that to permit in every case of the payment of a debt an inquiry as to the source from which the debtor derived the money, and a recovery if shown to have been dishonestly acquired, would disorganize all business operations and entail an amount of risk and uncertainty which no enterprise could bear. The rule is founded upon a sound general policy as well as upon that principle of justice which determines as between innocent parties upon whom the loss should fall under the existing circumstances. If, therefore, Smith had come with the money, and with it had paid his debt over the counter, the amount could not have been recovered by the plaintiff, although admitted to have been actual proceeds of the stolen certificate. I think the situation was not at all changed because the debtor came with Ferris & Kimball's check which the bank collected. If Smith had brought that and the bank had accepted it as cash or conditionally, upon its proving good, the result would have been the same. The debt would have been paid and the money become the absolute property of the bank." (*Hatch v. National Bank*, 147 N. Y. 184, 191, 41 N. E. 403.)

The cases from which these quotations are made are peculiarly applicable here because of the refusal of the New York courts to regard as an innocent purchaser for value one who accepts a negotiable instrument in payment of an existing obligation, without surrendering some security (4 A. & E. Encycl. of L. 288), while giving that standing to a creditor to whom money is paid under similar circumstances. This distinction is pointed out in one of the cases already quoted from in these words:

"It is said that the case is to be governed by the doctrine established in this State that an antecedent debt is not such a consideration as will cut off the equities of third parties in respect of negotiable securities obtained by fraud. But no case has been referred to where this doctrine has been applied to money received in good faith in payment of a debt." (*Stephens v. Board of Education*, 79 N. Y. 183, 187.)

3. It is suggested that the cashier acted as the agent of the owner in regard to the sale of the cattle and therefore that the bank was chargeable with all the facts known to Lockner. The draft was delivered by Benjamin to the cashier in accordance with the direction of the clerk of the sale, which was public. Lockner testified that he left the settlement for the cattle to the bank. The only connection the bank was shown to have had with the sale was in receiving the proceeds at the direction of Lockner. The arrangement seems to have contemplated their application to the overdraft, but no specific authority to that effect was necessary. (*Gunn v. Bank*, 97 Kan. 404, 155 Pac. 796.) Knowledge on the part of the bank that the draft was given in payment for the cattle had no tendency to charge it with notice of any fraud. It naturally looked to their proceeds for the payment of its claim against Lockner, since he had used its money in paying for them.

The bank seeks to invoke the rule that one who has voluntarily parted with the title to property, although induced to do so by fraudulent representations, can recover it from a third person only after a rescission of the contract. Because of the views already expressed it is unnecessary to consider what, if any, application might be made of that principle here.

The judgment is reversed and the cause is remanded with directions to render judgment for the defendant, the essential facts not being in dispute.