## BURNETT'S TRUST et al. v. FARMERS STATE BANK IN MEXIA.
### No. 2536.

Court of Civil Appeals of Texas. Waco.

July 22, 1943.

Rehearing Denied Nov. 24, 1943.

Thompson, Walker, Smith & Shannon and Luther Hudson, all of Ft. Worth, for appellants.

W. W. Mason, of Mexia, for appellee.

RICE, Chief Justice.

The Farmers State Bank in Mexia (hereinafter referred to as the Bank), brought this suit against C. G. White, a resident of Limestone County, Texas, and Mary Couts

454

Burnett Trust (hereinafter referred to as the trust estate), which maintained its place of business in Tarrant county, Texas, and in which county each of its trustees, also named as defendants, resided. Plaintiff sought to recover of defendants damages to the extent of the value of money which had been embezzled from plaintiff by White and delivered to John H. Sweatt, who in turn caused the embezzled money to be paid to the trust estate.

Trial was had to the court without the intervention of a jury, resulting in a judgment for plaintiff and against defendant White for the sum of $5,228, and a joint and several judgment against White and the trust estate for the sum of $4,086.42. From this judgment the trust estate alone appealed.

The trial court's findings of fact and conclusions of law are set forth in twenty pages of the transcript, and are too extensive to be incorporated in this opinion.

In substance, the trial court found: In May, 1939, John H. Sweatt was one of the trustees of the defendant trust estate, and at his request the remaining trustees authorized a deposit of $10,000 of the funds of the trust estate in plaintiff bank. At Sweatt's suggestion the secretary of the trust estate made the check for $10,000 payable to Sweatt, and mailed it to him at Mexia with a letter, signed by the secretary, stating that the check was to be deposited in the Farmers State Bank in Mexia to the credit of the trust estate. Sweatt, dealing with C. G. White, cashier of plaintiff bank, deposited the check in plaintiff bank to the credit of John H. Sweatt, trustee. Three days thereafter Sweatt withdrew the entire $10,000 so deposited on a check signed "John H. Sweatt, Trustee", payable to "Cash", stating to White at the time, "We are making a loan to Bass." Sweatt violated the instructions of the other trustees in making this deposit to the credit of himself as trustee; he being authorized by them to make the deposit to the credit of the trust estate. Sweatt had no authority to draw checks against any fund of the trust estate in any bank without the concurrence of the other trustees, or the concurrence of one of the trustees and its secretary. Sweatt had no authority to loan any of the funds of the trust estate to any person without the consent of a majority of the trustees. His conduct in depositing the money to his credit as trustee, and in withdrawing the same on his check,

was without the knowledge, consent, or acquiescence of the other trustees and beyond any power given him by the trust instrument, and was done for the fraudulent purpose of securing said sum of $10,000 for himself. His action constituted a conversion and embezzlement of said sum of $10,000.

When Sweatt made the deposit of $10,000 to the credit of himself as trustee, while White had no actual knowledge that the money deposited was the property of the trust estate, he knew that Sweatt was a trustee of the trust estate and he therefore assumed from the remarks made by Sweatt at the time he withdrew the entire sum so deposited, that it was the property of the trust estate and was being loaned by the trust estate to Bass. Other than the knowledge of White above set out, there was no actual knowledge by plaintiff bank or any of its officers that the money deposited by Sweatt to his own credit as trustee belonged to the trust estate either at the time it was deposited or at the time it was withdrawn.

From time to time after the check for $10,000 had been mailed to Sweatt, the secretary of the trust estate mentioned to Sweatt that no acknowledgment had been received from the bank of the deposit. Several months later the trust estate received a deposit slip showing such deposit and a ledger sheet showing such an account in the plaintiff bank. Both deposit slip and ledger sheet were on the regular stationery of the plaintiff bank, but each was prepared and forged by Sweatt.

Later, an independent auditor for the trust estate, in making his annual audit, forwarded to the bank a form to be executed by it verifying that the trust estate had a deposit with it in the sum of $10,000. This request for verification was received by Ralph Carmical, the active vice-president and executive officer of the bank. He wrote a letter to the auditor of the trust estate stating that there was no such deposit in the bank. This letter was never received by the auditor or the trust estate because Sweatt obtained it from the bank's porter. The trust estate did receive a letter dated April 4, 1940, on a letterhead of the bank, bearing the purported signature of C. G. White, cashier, stating there was such a deposit which had never been withdrawn. This letter was accepted by the auditor and the trust estate as the equivalent of a regular form of verifica-

tion. The above-mentioned letter dated April 4, 1940, was a forgery, prepared and executed by Sweatt.

On August 5, 1940, and at the request of the other trustees, John H. Sweatt resigned as a trustee of the trust estate. The other trustees at that time had no suspicion of any wrongdoing on the part of Sweatt in connection with the matters involved in this suit. His resignation was requested because the other trustees had no confidence in his judgment, and not because they lacked confidence in his integrity. As a result of his resignation a number of new trustees were appointed, and, in accordance with common practice in such cases, a new audit was ordered. This auditor sent another request to the bank for verification of the account, which the bank did not verify. However, the verification was returned with White's purported signature, forged by Sweatt, showing the account as being in plaintiff bank to the credit of the trust estate, and stating that the proceeds of the deposit had been remitted on August 29, 1940. On Sweatt's resignation the remaining trustees instructed its secretary to withdraw the money it thought it had in the plaintiff bank. There was no suspicion of Sweatt at his time because of the manner he had handled the $10,000 check, nor did the trustees suspect there was no deposit; the reason for making the withdrawal was the desire to have all the trust funds in the First National Bank of Fort Worth.

Pursuant to her instructions, the secretary prepared two drafts which she delivered to the First National Bank of Fort Worth to be forwarded to plaintiff bank for collection; and said Fort Worth bank and its vice-president and cashier, Martin, acted as agent for the trust estate in endeavoring to make collection thereof. One of the drafts was for $10,000, marked "Amount of Deposit", and the other was in blank, with the notation "Draft on you for interest on $10,000.00 deposit, 5–29–39, to 8—6—40." These drafts were received by Carmical of plaintiff bank. He made inquiry of White as to whether there was such a deposit, and on being informed by White that there was no such deposit, he marked the transmittal letters which accompanied the drafts, "Unpaid," and returned them to the First National Bank of Fort Worth. He wrote a letter to go with the drafts, stating there was no such deposit, and that he had no record of a de-

posit to the credit of the trust estate. The drafts were duly received by the Fort Worth bank but the letter written by Carmical was never received, and after Sweatt's suicide the original letter was found on his desk. Sweatt had obtained possession of this letter from the porter of plaintiff bank and consequently it was never mailed.

A day or two after the unpaid drafts were returned to the Fort Worth bank, one of the new trustees of the trust estate instructed Mr. Martin, cashier of the bank, to find out what was wrong. Martin thereupon telephoned plaintiff bank and White answered the call. In reply to Martin's inquiry as to why the drafts were not paid, White replied that he would have to investigate and would call him back. Thereupon White telephoned Sweatt, and, in turn, Sweatt telephoned Martin, stating that he was White, and advised him that the deposit was an interest-bearing time deposit, and that plaintiff bank would remit to cover the drafts on August 29th. White and Martin were not acquainted, and Martin was not particularly familiar, with White's signature or his voice. Martin thought that he was talking to White. Because of their clarity and conciseness and because we feel that we cannot further condense them, we quote what we deem material from the remaining findings of the trial court:

"A day or two later, Martin received a letter from Mexia, on the genuine stationery of the plaintiff bank, stating, in substance, the same thing that he had been told over the telephone, but the letter was unsigned, although it had a place for signature and the word 'Cashier' written on the typewriter below the signature space. Neither White nor any officer of plaintiff Bank wrote said letter or had any knowledge thereof until after Sweatt's death, in July, 1941. Martin informed the trustees that the plaintiff bank would remit on the 29th, and neither Martin nor anyone connected with the trust had any suspicion at this time that the Trust had never had a deposit in the plaintiff Bank, and at this time no one then connected with the Trust had any suspicion of Sweatt's integrity, or any knowledge of the connection between Sweatt and the plaintiff Bank's cashier White. * * * At this time the officers and directors of the plaintiff Bank had no actual knowledge of the connection between White and Sweatt. * * * Carmi-

456

cal, vice-president of plaintiff Bank, was suspicious of Sweatt, and because of White's apparent close connection with Sweatt, distrusted White, and as a result of such distrust, carefully checked all banking transactions. In spite of this suspicion and checking, however, * * * Carmical did not know either of White's shortage or of the fact that White was helping Sweatt to cover up Sweatt's theft from the Trust, as hereinafter set out, until long after the transactions on which this suit is based."

"In order to repay the Trust the money it thought it had on deposit with plaintiff Bank, and in order to cover up his tracks so that there would be no suspicion by the then trustees that he had not made a deposit of the original check for $10,000.00, hereinbefore mentioned, John H. Sweatt entered into a conspiracy with White and one R. B. Bass (Roy Bass) to carry out his plans, as set out in this paragraph. He ordered White to furnish currency of plaintiff Bank, the first amount being in the sum of $2,000.00, in currency of various denominations, which was delivered by White from the currency of the plaintiff Bank to Sweatt on August 29, 1940, in the office of plaintiff Bank, in Mexia, Limestone county, Texas. Later, on the same date, Sweatt instructed White to give Bass $1775.00 in currency of plaintiff Bank, which was done by White in the office of plaintiff Bank. * * * Sweatt took the $2,000.00 in currency of plaintiff Bank that had been delivered to him (Sweatt) by White, and together with Dallas Exchange in the sum of $6,500.00, and his personal check on the City National Bank of Mexia for $100.00, purchased a Cashier's check from the First National Bank of Wortham, Texas, in the sum of $8,600.00, payable to Bass. Bass took the $1775.00 in currency so delivered to him by White out of currency belonging to plaintiff Bank, and deposited same to his (Bass') credit in Prendergast-Smith National Bank of Mexia. Bass then took the Cashier's check for $8600.00 to plaintiff Bank and with such Cashier's check and his personal check for $1775.00 on Prendergast-Smith National Bank (being check on the deposit made by Bass with the currency of plaintiff Bank, delivered to Bass on August 29, 1940), purchased a draft in the sum of $10,375.00, payable to the order of First National Bank of Fort Worth, Texas. This draft was issued by White in behalf of the plaintiff Bank and was, as stated, payable to the order of First National Bank of Fort Worth, and was drawn on the First National Bank of Dallas, in which latter bank the plaintiff Bank carried a deposit in excess of said sum. This draft was given by White to Bass in plaintiff Bank, in Mexia * * * and White did not participate in the actual mailing of this draft; however, Sweatt mailed this draft to the First National Bank in Fort Worth, with a letter on the stationery of the plaintiff Bank, explaining that this was the proceeds of the deposit, with interest, and should be deposited to the credit of the Mary Couts Burnett Trust, and to this letter Sweatt again forged White's signature. This draft was duly received by the First National Bank of Fort Worth, and Martin, the cashier of that bank, following instructions in said forged letter, deposited said $10,-375.00 to the credit of the Mary Couts Burnett Trust in the First National Bank of Fort Worth. Martin actually made the endorsement on the back of this draft, 'Credit Mary Couts Burnett Trust'. I find, as a fact, that the signature on the said $10,-375.00 draft was the genuine signature of C. G. White and the signature on the accompanying letter was a forgery. In this connection I find as a further fact that Martin was not familiar with the signature of White, but that the genuine signature of White on the draft for $10,375.00 and the purported signature of White to the letter (which was lost and therefore not produced upon the trial of this cause), accompanying such draft were dissimilar to the extent that Martin, vice-president and cashier of The First National Bank of Fort Worth, when his deposition was taken, on May 7, 1942, was able to recall that the genuine signature of 'C. G. White' to the draft for $10,375.00 then shown him was different to the signature of the forged letter accompanying such draft, and which letter also purported to be signed by C. G. White, as cashier of plaintiff Bank. However, the court finds that the conduct and actions of Martin, vice-president and cashier of said First National Bank of Fort Worth, as hereinabove found, are insufficient to show bad faith on the part of Martin, and the court, therefore, does not find that he acted in bad faith in his connection with the $10,375.00 draft. Martin, in accordance with the instructions contained in said forged letter accompanying the draft, deposited said $10,375.00 draft to the credit

of Mary Couts Burnett Trust, as above set out, such draft being by him treated and handled as a cash item and not as a check or draft for collection. Martin then stamped said draft with endorsement of First National Bank of Fort Worth, which stamp read: 'All prior endorsements guaranteed. Pay to the order of any bank, banker or trust company.' This draft was then forwarded to The Federal Reserve Bank in Dallas, which Reserve Bank stamped on the back thereof, 'Collected through Dallas Clearing House—Federal Reserve Bank of Dallas—8-31-40,' and it was finally collected by the Federal Reserve Bank in Dallas from the First National Bank in Dallas. The actual procedure on the collection of this draft was that, on August 30th, the First National Bank of Fort Worth credited the sum of $10,375.00 as cash to the Mary Couts Burnett Trust. The First National Bank in Fort Worth then forwarded the draft as a cash item to the Federal Reserve Bank in Dallas, endorsed as above set out. The Federal Reserve Bank then gave the First National Bank of Fort Worth credit for the sum of $10,375.00 and collected that amount from the First National Bank in Dallas, which First National Bank in Dallas obtained its $10,375.00 which went to the Federal Reserve Bank, by charging the account of the plaintiff Bank in the First National Bank in Dallas. This draft was finally paid and the account of the plaintiff Bank charged with $10,375.00. On August 31, 1940, in accordance with ordinary banking procedure, the draft was finally returned to the plaintiff Bank in the statement of its account with the First National Bank in Dallas.

"The foregoing procedure for the collection of said draft, and its final payment, was in accordance with the usual and customary banking practice where the draft was handled as a cash item. * * *

"Mary Couts Burnett Trust had set up on its books an account showing a deposit in the plaintiff Bank. On being notified by Mr. Martin that said draft had been received, and on receipt of deposit slip from him showing a deposit to the Burnett Trust in the sum of $10,375.00, the Burnett Trust closed said account on its books, showing the payment of the deposit and interest, and said account was closed out on its books as paid on August 31, 1940, and the sum of $10,375.00, was shown as cash on deposit in the First National Bank of Fort Worth. In this connection I find that the Mary Couts Burnett Trust never had a deposit with the plaintiff Bank, and neither was Bass ever indebted to the Mary Couts Burnett Trust in any sum or amount.

"Sweatt committed suicide in July, 1941, and thereafter White made a confession to the President of plaintiff Bank that he was short in plaintiff Bank in excess of $16,-000.00, which included the items involved in this suit, and all of which Sweatt had received.

"At the time of the trial Bass was also dead. * * *

"I find that $3,775.00 of the currency so embezzled by White went into the purchase of the draft for $10,375.00 above mentioned, and in the way and manner as hereinabove found, which draft was endorsed in the manner above stated by First National Bank of Fort Worth and the amount of such draft credited to the account of Mary Couts Burnett Trust. In short, I find that $3,775.00 of the currency and money of the plaintiff Bank embezzled by White has been traced by the plaintiff Bank to the Mary Couts Burnett Trust.

"I find that White in embezzling such sum of money above set out and Sweatt and Bass in knowingly participating in said theft, became constructive Trustees of such currency and as such constructive Trustees, had no right to use this money for their own purposes.

"I find that Mary Couts Burnett Trust, its Trustees, Agents, Servants and Employees, had no actual knowledge of the source from which any part of the funds used to purchase the $10,375.00 draft came, until July 19, 1941. I find, as a fact, that until July, 1941, the defendant Trustees, defendant Trust and its Agents, Servants and Employees, had no actual knowledge or notice that said Trust did not have a deposit in the Farmers State Bank, and that said Trustees and their employees in actual good faith thought that such deposit did exist and thought that it was being repaid by the $10,375.00 (proceeds of such draft), and in good faith credited said sum to said account and charged it off as paid and satisfied. I find that said Trustees, on August 30, 1940, and in fact from August 6, 1940, until July of 1941, at all times acted in good faith, and had no notice, actual or implied, of any use of plaintiff Bank's funds and money in the purchase of the draft for $10,375.00 and in receiving said $10,375.00 so deposited to its credit in the First Na-

tional Bank of Fort Worth and in crediting same to said purported and supposed account of plaintiff Bank with it, and in marking same paid, the said Trust, the Trustees and its employees at all times acted in good faith, in the good faith belief that they were entitled to receive said funds and that there was no defect in the title thereto. * * *

"I find that Sweatt did misappropriate said $10,000.00 in violation of his active trust and contrary to the instructions and authority imposed on him. I find that by reason of such misappropriation by Sweatt he became a constructive trustee and was indebted to said Trust for said sum of money. In accordance with this finding, and the preceding finding, I find that at the time of the issuance of the $10,375.00 draft dated August 29, 1940, and the receipt thereof by the First National Bank of Fort Worth, the defendant Trust thought the plaintiff Bank was indebted to it and actually credited on its books the proceeds of said draft, such credit being placed on its books to the account which said Trust thought plaintiff Bank owed it. I find, however, that said plaintiff Bank, at said time, was not indebted to the defendant Trust, but that John H. Sweatt was indebted, solely and only by reason of his act in the misappropriation of the $10,000.00 check issued by the Trust dated May 27, 1939, and hereinabove mentioned. In short, I find that a debt did exist, owed to the defendant Trust, but it was owed by Sweatt and not by the plaintiff Bank; and I find that Sweatt used $3,775.00 of the currency embezzled by White in Mexia, Limestone County, Texas, to purchase the draft for $10,375.00 in way and manner mentioned, and above found, the proceeds of which draft were credited to account of Mary Couts Burnett Trust by First National Bank of Fort Worth, and such proceeds credited by said Trust to the account said Trust thought it had against the plaintiff Bank, by reason of the fact that it thought Sweatt had deposited in plaintiff Bank to the credit of said Trust the $10,000.00 check of said Trust, and said Trust had, as stated, set up on its books an account showing such deposit."

In so far as material here, the court concluded as a matter of law:

"That since $3775.00 of the money belonging to plaintiff Bank went into the purchase of the draft for $10,375.00, which draft was sent to the First National Bank of Fort Worth, with a forged letter of instructions to credit such draft to account of Mary Couts Burnett Trust; and such forged letter legally amounted to no instructions except as same may affect the good faith of the First National Bank of Fort Worth; and since the First National Bank of Fort Worth, who paid nothing for the draft, deposited and entered the proceeds of such draft to the credit of Mary Couts Burnett Trust, and since at the time, plaintiff Bank was not indebted to the defendant Trust and had never been indebted to such Trust in any sum or amount; and since the defendant Trust credited the entire proceeds of such draft to the account it supposed and thought it had against the plaintiff Bank; such Trustee when informed of the receipt by it of the money belonging to plaintiff Bank, and of the fact that plaintiff Bank was never indebted to the defendant Trust in any manner, cannot successfully urge that the funds (proceeds of such draft) were credited to an account it thought it had against plaintiff Bank; and that they therefore nevertheless were entitled to retain the entire proceeds of such draft, including the said item of $3775.00 and treat it as a credit on an indebtedness owed by John Sweatt.

"I conclude as a matter of law that defendant Trustees of Mary Couts Burnett Trust were not holders in due course of the $10,375.00 draft issued by the plaintiff Bank, for each of the following reasons:

"(A) * * * The defendant Trust was not the payee of the said $10,375.00 draft, and such Trust was not a holder in due course of such draft, because it was never delivered to them by the First National Bank of Fort Worth.

"(B) * * * I find that the endorsement placed by the First National Bank of Fort Worth on said draft, which contained the following language: 'All previous endorsements guaranteed. Pay to the order of any Bank, Banker or Trust Co.', constituted a restricted endorsement and destroyed the negotiability of said draft.

"(C) * * * If in said draft, although payable to the First National Bank of Fort Worth, the defendant Trust was the actual payee thereof, then said First National Bank of Fort Worth was merely acting as agent for said Trust, and such Trust was not the holder thereof. in due course.

"(D) * * * Because the draft for $10,375.00, payable to the First National Bank of Fort Worth, being credited to the

account of Mary Couts Burnett Trust, such Trust was not a holder thereof in due course, because same was by said Trust credited to the account of plaintiff Bank, when, in fact, plaintiff Bank then owed it nothing and had never been indebted to defendant Trust; the indebtedness to the defendant Trust occurring by reason of Sweatt's misappropriation of the $10,000.00 check, being owed to defendant Trust by John Sweatt.

"I further conclude, as a matter of law, that since defendant Trustees were not holders in due course of said $10,375.00 draft, the plaintiff Bank, as beneficiary under the constructive trust created when White embezzled said plaintiff's funds and turned them over to Bass and Sweatt, have traced into said $10,375.00 draft $3,775.00 of said embezzled funds, and since I have found above that defendant Trustees are not holders in due course of said $10,375.00 draft, and for other reasons and conclusions herein stated, I conclude that plaintiff Bank is entitled to recover $3,775.00 of its funds used in the purchase of said draft.

"I conclude that plaintiff Bank having made a demand for $4,375.00 on August 19, 1941, of said Trustees, after furnishing said Trustees and their attorneys with information as to the source of the money used to purchase the $10,375.00 draft, which was credited by said Burnett Trust on August 30, 1940, and that said defendants, on advice of counsel, having refused to pay the same, said refusal constituted a conversion thereof on said August 19, 1941; and plaintiff is entitled to interest at the rate of six per cent (6%) per annum of $3,775.00 from that date."

It is the contention of the trust estate that the trial court erred in rendering judgment for the plaintiff bank and in not rendering judgment in its favor:

(1) Because, even though the currency here involved was stolen from the plaintiff bank, the proceeds were received by the trust estate, without notice, in payment of an antecedent debt, thereby constituting the trust estate a holder in due course and a bona fide purchaser.

(2) Because the money obtained from plaintiff bank by the fraud and embezzlement of White and Sweatt was received by the trust estate in payment of an antecedent debt in good faith and without notice of the fraud or embezzlement.

It seems to be well settled that as to currency and negotiable instruments the ordinary rule of notice does not apply to a purchaser for a valuable consideration before maturity. The test is good faith, and not diligence or negligence. American Surety Co. v. Fenner, 133 Tex. 37, 125 S. W.2d 258, 259; Young v. Pecos County, 46 Tex.Civ.App. 319, 101 S.W. 1055, error refused.

As to either currency or negotiable instruments, the rule is that the person who takes the same in payment of, or as a credit upon, an antecedent debt, is a taker for value. Sec. 25, Art. 5933, R.C.S.; 42 T.J., p. 728, sec. 113; W. Horace Williams Co. v. Vandaveer, Brown & Stoy, Tex.Civ.App., 84 S.W.2d 333; 8 Amer. Jur., p. 186, sec. 439.

The law is well settled that one, who has in good faith received currency in payment of an existing debt, cannot be compelled to repay such currency because it subsequently develops that the currency paid had been embezzled or stolen by the one who made the payment. The rule is stated in 40 Amer.Jur. p. 747, sec. 49, as follows: "There is no doubt that a thief may use stolen money, or stolen negotiable securities before their maturity, to pay his debts. The authorities are uniform that where the money is received in good faith, and in the ordinary course of business, and for a valuable consideration, it cannot be recovered back because it was wrongfully obtained of some other person by the payor. To hold otherwise would be to put every man who received money in the due course of his business on inquiry, at his peril, as to the manner in which such money was procured by the payor."

See, also, Young v. Pecos County, supra; Texas State Bank v. First Nat. Bank, Tex. Civ.App., 168 S.W. 504; Texas Sporting Goods Co. v. Texas Gulf Sulphur Co., Tex. Civ.App., 81 S.W.2d 805; Greneaux v. Wheeler, 6 Tex. 515; Rankin v. Chase Nat. Bank, 188 U.S. 557, 23 S.Ct. 372, 47 L.Ed. 594; American Surety Co. v. Fenner, 133 Tex. 37, 125 S.W.2d 258, 259.

Therefore, applying the foregoing rules of law, we are forced to the conclusion that if the trust estate had charged the indebtedness of $10,000 on its books against Sweatt, and had Sweatt actually delivered the embezzled currency to the trust estate in payment of his debt, then, since the trial

court has found that the trust estate acted in good faith and without notice in accepting the money and in applying it on its existing debt, the plaintiff bank could not have prevailed.

By his fraudulent acts, Sweatt led the trust estate to believe that the plaintiff bank was indebted to it in the sum of $10,000, and it therefore had charged the bank on its books with that sum. It was this account that it credited with the $10,375 that it received through the First National Bank of Fort Worth. Plaintiff bank contends that since it owed the trust estate nothing, the payment was credited on a fictitious or non-existing debt. It is true that the debt was mislabeled; but it is also true that a valid indebtedness existed. When the trust estate applied the money it received from the First National Bank of Fort Worth in payment of the account set up on its books against plaintiff bank, Sweatt's debt to the trust estate was paid. It seems to us that the real question at issue is not who owed the debt, but rather did the trust estate pay a valuable consideration for the money by receiving it in payment of a pre-existing debt. The fact that it did so receive and apply the money cannot, we think, be seriously questioned. Nassau Bank v. National Bank of Newburgh, 159 N.Y. 456, 54 N. E. 66.

■ Plaintiff bank contends that it is entitled to recover of the trust estate because the latter was not a holder in due course of the draft for $10,375. This draft was payable to the order of the First National Bank of Fort Worth and was mailed to said bank with a letter written on a letterhead of plaintiff bank, explaining that the sum of money transmitted was the proceeds of the deposit, with interest, and should be deposited to the credit of the Mary Couts Burnett Trust. Sweatt forged White's signature to this letter. The draft was not endorsed by the Fort Worth bank and delivered to the trust estate, but was handled as cash and credit therefor was given the trust estate. The Fort Worth bank then forwarded the draft through regular banking channels to the bank on which it was drawn and it was paid. We are inclined to agree with the trial court's conclusion that the Fort Worth bank was not a holder in due course of the draft because, among other reasons, it was the named payee therein. J. I. Case Threshing Machine Co. v. Howth, 116 Tex. 434, 293 S.W. 800; Brinker v. First Nat. Bank of Cleveland, Tex.Com.App., 37 S.W.2d 136. But this is not a suit on the draft; it is a suit to recover of the trust estate because it received and appropriated money, or the proceeds thereof, stolen from the plaintiff. After the draft was paid by the bank on which it was drawn, its office was performed and it was no longer material except to evidence the method by which Sweatt transferred the money to the trust estate. We are of the opinion that the fact that Sweatt adopted the method of transmitting the embezzled money to the trust estate by bank draft through regular banking channels, rather than by delivering the very currency which he embezzled, is of no controlling importance. The ultimate and controlling facts are that the trust estate received, in good faith, the embezzled funds and applied them in the payment of a pre-existing debt. Benjamin v. Welda State Bank, 98 Kan. 361, 158 P. 65, L.R.A.1917A, 704; Holly v. Domestic & Foreign Missionary Society, 2 Cir., 92 F. 745; Goshen Nat. Bank v. State, 141 N.Y. 379, 36 N.E. 316; Hatch v. Fourth Nat. Bank, 147 N.Y. 184, 41 N.E. 403; W. Horace Williams Co. v. Vandaveer, Brown & Stoy, supra.

In our opinion, the fact that the draft for $10,375 was accompanied by a forged letter of instruction is of no material importance. The instructions were followed in good faith by the Fort Worth bank when it paid the funds represented by the draft to the trust estate. The forged letter of instructions was only one of the many artifices employed by Sweatt in getting the embezzled funds to the trust estate in such manner that the latter would not suspect he had theretofore embezzled the funds. It occurs to us that the mode by which Sweatt accomplished his purpose is beside the point. The material fact is he caused the embezzled funds to be delivered to the trust estate. The title to these funds passed to the trust estate upon the delivery thereof. Its title thereto was not dependent upon the title of the Fort Worth bank to the draft. Having in good faith applied these funds to the payment of an existing debt, the trust estate is not liable to plaintiff bank therefor.

■ Error is assigned to the action of the trial court in overruling the plea of privilege of the defendants to be sued in Tarrant county. Although the matter is not entirely free from doubt, we have reached the conclusion that the trial court's

judgment in this respect should not be disturbed, and this assignment is accordingly overruled.

Plaintiff bank takes the position that the findings of fact filed by the trial court, as a matter of law, constitute bad faith on the part of the trust estate, and its agent, The First National Bank of Fort Worth, and that it was fundamental error, apparent upon the face of the record, for the trial court not to so hold. In connection with this counter-point, we have carefully reviewed the trial court's findings of fact, and have reached the conclusion that this assignment should be overruled.

For the reasons above set forth, the judgment of the trial court in overruling the plea of privilege of the defendants, and in rendering judgment in favor of plaintiff bank against C. G. White (who did not appeal), is in all respects affirmed; and the judgment of the trial court in favor of plaintiff bank against the trust estate is reversed and judgment is here rendered that plaintiff bank recover nothing from the defendant trust estate.

PER CURIAM.
On motion for rehearing.
Rehearing denied.

TIREY, Justice (dissenting).

Upon further consideration, I am of the opinion that this court erred in that part of the opinion heretofore rendered, wherein the judgment of the trial court in favor of the plaintiff bank against the trust estate was reversed and judgment rendered that the bank take nothing from the trust estate.

The opinion of the court carefully and accurately states the factual situation. I adopt the conclusions of law made by the trial court as applicable and controlling to the disposition of this cause. These conclusions are set out in the opinion and it would serve no useful purpose to re-state them.

It is my view that this cause of action is controlled by our Uniform Negotiable Instruments Act, particularly Articles 5933 and 5935, Revised Civil Statutes. That being true, plaintiff bank was entitled to assert all of the rights vouchsafed to it by the provisions of the act since the trust estate was not a holder of the draft in due course. See American Surety Co. v. Fenner, 133 Tex. 37, 125 S.W.2d 258;

6 Tex.Jur. 717, sec. 99, page 838, sec. 195. Since the trust estate credited said draft to the account of the plaintiff bank, and since plaintiff bank owed such trust estate nothing, the trust estate paid no consideration for the draft. Section 25 of Article 5933, supra, provides: "Value is any consideration sufficient to support a simple contract. An antecedent or pre-existing debt constitutes value; and is deemed such whether the instrument is payable on demand or at a future time." Since plaintiff bank was not indebted to the trust estate, there was an absence of consideration sufficient to support a simple contract. When the trust estate credited the draft to the account of the plaintiff bank to satisfy an indebtedness that it did not owe, the trust estate parted with nothing, nor did it alter or worsen its position; nor did such trust estate have the right to credit such draft to an indebtedness owed to it by Sweatt after such trust estate had actual knowledge of the facts. To hold otherwise would, in my opinion, nullify the provisions of said Articles, and particularly section 25 of Article 5933, supra, and section 58 of Article 5935, supra.