Peter J. Peterson and Bessie Peterson, Plaintiffs-Appellants, v. Joseph A. Rosin, et al., Defendants-Appellees.

Gen. No. 49,718.

First District, Fourth Division.

July 14, 1965.

Rehearing denied September 23, 1965.

Posanski, Johannsen, Krohn & Jacobs, of Chicago, for appellants.

Jerome H. Torshen, of Chicago, for appellee.

MR. PRESIDING JUSTICE McCORMICK delivered the opinion of the court.

This appeal is taken from a judgment awarding $2,383.42 to the plaintiffs, Peter J. Peterson and Bessie Peterson, and $11,917.06 to Joseph A. Rosin, one of the defendants in the case. The case grew out of a fire which occurred on October 26, 1960, in a building jointly owned by the plaintiffs at 7108–12 West Grand Avenue, Chicago, Illinois.

One William Walsh, who did business in the name of Wm. Andrew & Co., was an experienced insurance

adjustor and contractor. After the fire he contacted the Petersons and on November 27, 1960, a contract was entered into between the Petersons and Wm. Andrew & Co. for the repair of the building. The contract does not appear in the record and the only information concerning its contents is that during the trial it was stipulated that the contract provided for making adjustment of the fire loss on behalf of the Petersons and for doing all the repairs and restoring the building to its former condition for the sum which should be received from the insurance companies as a result of the adjustment.

On December 7, 1960, the Petersons signed the following "assignment of claim."

CITY OF CHICAGO⎫ SS:
COUNTY OF COOK⎭

Know all men by These Presents, That PETER J. PETERSON and BESSIE PETERSON, of the City of Chicago, County of Cook and State of Illinois, having sustained a fire loss at 7108–12 Grand Avenue on October 25, 1960, and being insured in the Bankers and Shippers under Policy No. 184487140 (see below), in the amount of $12,500.00 for and in consideration of the sum of One Dollar ($1.00) and for other good and valuable consideration, do hereby sell, assign, transfer and set over unto Wm. Andrew & Co., and Joseph A. Rosin all of our rights, title and interest in the above mentioned policy and we do hereby appoint them true and lawful attorney to act in our name, place and stead, giving and granting unto them full Power of Attorney to sign proofs of loss, endorse drafts or checks, and sign receipts for same, and to sign any other papers or instruments that may be necessary in the adjustment of said loss and collection of said claim.

Dated at Chicago, Illinois, this 7th day of December, 1960.

/s/ Peter J. Peterson
/s/ Bessie Peterson

The same "assignment of claim" was prepared and signed by the Petersons with reference to three other insurance companies involved, indicating the respective amounts of the insurance. On December 9, 1960, Walsh made the same type of "assignment" heretofore set out to defendant, Joseph A. Rosin, in which assignment the four insurance companies were mentioned.

Joseph A. Rosin, one of the defendants, was a lawyer who had had certain prior financial transactions with Walsh and to whom Walsh owed money. Walsh apparently needed money to get started on the repairs of the Peterson building. Rosin agreed to advance the money to Walsh, and in order to protect himself, had his name included in the "assignments" signed by the Petersons.

Walsh started the repair work of the building which continued during October, November and December. Walsh died on about January 16, 1961.

The policies were adjusted for $14,300.48. Pursuant to the "assignments" checks dated December 19, 1960, were issued by the Reliable Insurance Company in the sum of $6,852.31, and by the U. S. Fire Insurance Company in the sum of $5,064.75. These checks were payable to Peter J. Peterson, Bessie Peterson, Wm. Andrew & Co., and Joseph A. Rosin. The first two checks were delivered to Walsh and another defendant in the instant suit, Maurice C. Blaz, who did some work with Walsh in both the adjustment and the contracting field. The Petersons, upon receipt of the checks, endorsed them and turned them over to Walsh who was working on the repairs and needed money.

343

The checks were endorsed by Walsh, d/b/a Wm. Andrew & Co., and given to Rosin who deposited them.

From time to time Rosin gave checks to Walsh, which checks were cashed and used to pay workmen on the Peterson repair job. Two other checks, dated January 5, 1961, had been issued as a part of the adjustment deal; one from Equitable Fire and Marine Insurance Company for $1,191.71, and the other from Bankers and Shippers Insurance Company of New York, also in the sum of $1,191.71. These two checks were also payable to Peter J. Peterson, Bessie Peterson, Wm. Andrew & Co., and Joseph A. Rosin, and they were not endorsed. They were returned to the insurance companies and deposited by them with the Clerk of the Circuit Court.

After Walsh's death the Petersons engaged another contractor to complete the job and paid him approximately $5,500, besides taking care of outstanding liens in the sum of $2,216.89.

The Petersons filed a complaint in the Circuit Court of Cook County on November 27, 1961, against Joseph A. Rosin, Maurice C. Blaz, the Equitable Fire and Marine Insurance Company, and the Bankers and Shippers Company of New York, in which complaint they alleged that the building was insured against fire by the four insurance companies; that Walsh was engaged by the Petersons to adjust the claims; that Walsh also represented to the plaintiffs that he was engaged in the construction business with Rosin and Blaz under the name of William Andrew & Co.; and that thereupon the contract with William Andrew & Co. for repair of the building was entered into, which contract provided that the building would be repaired by the said company for the monies received from the insurance companies upon the adjusted loss, which turned out to be $14,300.48. In the complaint there

were certain allegations with reference to the amount of money which should be paid to William Andrew & Co., and it was alleged that 50 percent would be paid immediately upon receipt of the drafts from the insurance company; that an additional 25 percent would be paid when 60 percent of the work was completed; and that the balance of the proceeds would be held in escrow until the work was fully completed. No proof of this allegation appears in the record. There were also allegations with reference to the expense of completing the job after the death of Walsh; that Rosin and Blaz had wrongfully misappropriated for their own use the sum of $11,917.06; that no part of that money was used to pay the subcontractors and material men who were working on the repair of the building; that the two other drafts from the Equitable Fire and Marine and Bankers and Shippers Company, amounting to $2,383.42, including defendants as payees, were still unused and in the possession of the Petersons; and that the insurance companies have refused to cancel the checks and issue new ones, payable to the Petersons only. The plaintiffs prayed that Rosin and Blaz might be adjudged to hold $11,917.06 in trust for the plaintiffs and be required and ordered to pay the same to them; and that the Equitable and Bankers companies should be ordered to cancel their drafts and issue new ones in the same amounts to the plaintiffs.

Rosin filed an answer to the complaint in which he denied that he was engaged in the construction business or that he was doing business with any persons under the name of Wm. Andrew & Co., and he further denied that he had anything whatsoever to do with reference to the repair of the Peterson building. He admitted receipt of the two checks but stated that he had no knowledge as to the manner of payment provided in the contract to repair plaintiffs' building. He

345

also denied that he entered into any fraudulent scheme to deprive the plaintiffs of the proceeds of the fire loss. He alleged that he did advance certain monies to William Walsh, d/b/a Wm. Andrew & Co.; that he accepted an assignment from Walsh of any interest that Walsh held in the drafts; that the two checks in the amount of $11,917.06 were issued and that they were endorsed by the Petersons and Walsh, d/b/a Wm. Andrew & Co., and delivered to the defendant; that the defendant had no knowledge of any infirmities or defenses and relied upon the prior endorsement and as a bona fide holder for value negotiated said instruments. The Petersons filed a reply. The case was tried before a court without a jury.

The contract, as we have stated, does not appear in the record. On December 20, 1963, the court entered a judgment denying the Petersons' claim against Rosin in the amount of $11,917.06, and awarding to the plaintiffs $2,383.42, the amount of the checks which had been deposited with the Clerk of the Circuit Court. From that judgment the plaintiffs take this appeal. The plaintiffs' claim against Blaz was dismissed.

■ ■ The so-called "assignment of claim" is one of the short cuts used in order to facilitate an insurance adjustor's negotiations with the insurance companies. It does, in apt words, assign the complete interest of the insured in the policy and in the proceeds from the loss. It also appoints the adjustor an attorney-in-fact for the purpose of signing proofs of loss, endorsing drafts or checks, and signing any other papers or instruments that may be necessary in the adjustment of the loss and the collection of the claims. However, once the insurance loss has been adjusted and the insurance company issues the check for such adjusted loss, payable to the adjustor and the owner of the property, it does not necessarily mean that the owner has relinquished all his rights in the proceeds

of the loss. Assuming that the adjustor brings the check for the total adjusted loss to the property owner, the adjustor under ordinary circumstances would be entitled only to whatever sum was agreed upon for his work in adjusting the loss, or the customary amount paid for such services. Nor could it be said, under such circumstances, that had the owner of the property endorsed the checks the adjustor would be a holder in due course, either under the N. I. L. or the Uniform Commercial Code, since he would be entitled to only a part of the proceeds. However, in the instant case, the adjustor was to receive the total amount of the adjustment, and we must therefore determine whether, under the facts, Rosin was a holder in due course.

There was neither privity nor even acquaintanceship between the Petersons and Rosin. As we have said, Rosin was a lawyer and had on previous occasions dealt with Walsh in his capacity as a contractor and otherwise. In his testimony Rosin stated that in order to protect himself he directed that he get some form of "indicia in writing from Peterson, so my name would be included on the loss payable drafts to protect my interest; so that I would be assured of repayment of the monies that I had advanced for the work to be done on this project. Assignments were presented to me, and they were signed by Bessie and Mr. Peterson, and they were made out to William Andrews and Company and myself." Rosin testified that Walsh had represented to him that he, Walsh, would do the repair work and that he relied on the fact that Walsh would receive all the adjusted insurance funds from the Petersons and that he would repay Rosin from those funds. The endorsed checks from the two insurance companies were turned over to Rosin in payment of the funds which he had advanced and would advance to Walsh. In fact, Rosin's

testimony is that he advanced to Walsh for repairs on the Peterson building, monies in excess of $13,000 Blaz corroborated the testimony of Rosin.

■■ This is not a suit between the Petersons and Walsh or Walsh's estate, and it is not necessary to attempt to determine what the holding should properly be under those circumstances. This case must be decided under the Negotiable Instruments Law. The Uniform Commercial Code did not become effective until July 1, 1962. Ill Rev Stats 1961, c 98, § 72 defined a holder in due course as:

> "A holder in due course is a holder who has taken the instrument under the following conditions:
>
> 1. That the instrument is complete and regular upon its face.
> 2. That he became the holder of it before it was overdue, and without notice that it has been previously dishonored, if such was the fact.
> 3. That he took it in good faith and for value.
> 4. That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

Ill Rev Stats 1961, c 98 § 76, defined notice:

> "Notice of defect—What is.
>
> "To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith."

Under the N. I. L. there was some dispute as to whether or not a payee could be a holder in due course.

See 11 Am Jur2d, Bills and Notes, § 418, where it is pointed out that the majority view which is followed in Illinois was that the payee of a negotiable instrument could be a holder in due course and that he may be regarded as such so as to hold him free of defenses asserted against him. See Drumm Const. Co. v. Forbes, 305 Ill 303, 137 NE 225. The rule also is that the holder take the instrument not only for value but in good faith, and that at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it. Under the N. I. L. "notice" means actual notice and not constructive notice.

 The plaintiffs argue that the defendant, Rosin, was a fiduciary of the plaintiffs as a matter of law. That might have been true if no contract had been entered into between the Petersons and Walsh requiring Walsh to repair the burned building and entitling him to receive and retain the entire amount of the money paid by the insurance companies. There is no indication anywhere in the record that Rosin had any knowledge that there was any particular time at which this money was to be paid out by Walsh. All he knew was that the checks endorsed by the Petersons were given to Walsh and that he had made payments of over $13,000 to Walsh for the repair of the Peterson premises and that such work was in progress. Whether or not Walsh was in the position of a fiduciary as far as the Petersons are concerned is immaterial; it is clear that Rosin was not. There is nothing in the record to indicate that Rosin was acting in bad faith; nor is there any element of fraud involved. Knowledge of an executory contract or promise unperformed on the part of a payee would not destroy an instrument's negotiability. Siegel, Cooper & Co. v. Chicago Trust & Sav. Bank, 131 Ill 569, 23 NE 417. Nor were there present here any facts which would meet the require-

ments necessary to constitute Rosin a constructive trustee. See People ex rel. Nelson v. Chicago Bank of Commerce, 296 Ill App 497, 16 NE2d 601. Also see ILP, Trusts, §§ 65 and 66. In Merritt v. Boyden & Son, 191 Ill 136 (1901), 60 NE 907, in affirming the judgment that the holder was a holder in due course, the court cited Comstock v. Hannah, 76 Ill 530. The Comstock case quoted from Murray v. Lardner, 2 Wall 110, which said:

> "The party who takes it (commercial paper) before due, for a valuable consideration, without knowledge of any defect of title, and in good faith, holds it by a title valid against the world. Suspicion of defect of title, or the knowledge of circumstances which would excite such suspicion in the mind of a prudent man, or gross negligence on the part of the taker, at the time of the transfer, will not defeat his title. That result can only be produced by bad faith on his part. . . . The duty of active inquiry does not rest on the purchaser of commercial paper, to avert the imputation of bad faith. The rights of the holder are to be determined by the simple test of honesty and good faith, and not by a speculative issue as to his diligence or negligence."

In the Merritt case the court also cited and quoted from Shreeves v. Allen, 79 Ill 553, where it was said:

> "Where a person takes an assignment of a promissory note before due, for a valuable consideration, and is not guilty of bad faith, even though he may be guilty of gross negligence, he will hold it by a title valid against the world, and it will not, in his hands, be subject to the defense of failure of consideration; that mere negligence on the part of an assignee of negotiable paper is not sufficient

to deprive him of the character of a bona fide holder, . . ."

In South Shore Securities Co. v. Goode, 5 Misc2d 972, 162 NYS2d 962 (1957), a builder who was putting up an animal hospital for the defendant ran short of funds and had executed an assignment to the plaintiff of $4,500 which was to be the first installment due under the contract, but payable in the future. Relying on the assignment, the plaintiff advanced the money to the builder and filed a copy of the assignment with the defendant, who was having the hospital built. Thereafter, the defendant executed a check payable to the plaintiff and gave it to the builder with instructions to endorse it with the words "Payment Approved." The check was sent by the builder to the plaintiff who deposited it to his account on the day of its receipt. Four days before the check was deposited the builder had abandoned the work by refusing to perform any more of the construction. In addition to the check outstanding, the defendant had about $4,500 of unpaid claims for labor and material furnished to the building. It was stipulated that at the time the check was received the plaintiff had no knowledge of any breach of contract between the builder and the defendant, and that the plaintiff was a holder in due course within the meaning of the N. I. L. The court found that at the time of the contract the plaintiff was unaware of any breach of contract. In holding for the plaintiff, the court stated that the fact that the holder knew that the note was given pursuant to an executory contract or that there might be a breach of contract did not remove his status as a holder in due course. Citing Tradesman's Nat. Bank v. Curtis, 167 NY 194, 60 NE 429, and National Bank of Watervliet v. Martin, 196 NYS 714, 139 NE 755 (1923).

351

No proof was adduced by plaintiffs that Rosin was in the construction business with Walsh. The only testimony by Peter J. Peterson concerning Rosin was:

> "I heard of Joseph A. Rosin from a fellow who is dead. I never met him before. I never knew him personally. I executed some assignments, I signed some papers for Mr. Walsh."

We therefore find that Rosin was a holder in due course and was entitled to the sum of $11,917.06 evidenced by the insurance companies' checks which had been endorsed by the Petersons.

No cross-appeal has been filed for Rosin, and in consequence, we are not concerned with the propriety of the trial court's order in awarding $2,383.42 to the plaintiffs. A motion was made by defendant Rosin to dismiss the appeal on the ground that since the Petersons had accepted the two checks to which the court found they were entitled, they were estopped, the theory being that having accepted the benefits of a portion of the decree the adverse provisions of the decree cannot be challenged. This motion was taken with the case and since we are finding in this opinion in favor of the defendant it is not necessary to consider the motion. The judgment of the Circuit Court of Cook County is affirmed.

Affirmed.

DRUCKER and ENGLISH, JJ., concur.