THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* VITO LOMBARDI, Defendant-Appellant.

(No. 57278;

First District (5th Division)—July 27, 1973.

Gerald W. Getty, Public Defender, of Chicago, (Judith Smith Leland and James J. Doherty, Assistant Public Defenders, of counsel,) for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Elmer C. Kissane, Lawrence Morrissey, and Cary Lind, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE ENGLISH delivered the opinion of the court:

OFFENSES CHARGED.

Conspiracy to commit theft. Ill. Rev. Stat. 1969, ch. 38, par. 8—2. Theft. Ill. Rev. Stat. 1969, ch. 38, par. 16—1(a)(1).*

JUDGMENT.

After a jury trial, defendant was found guilty of both charges and on October 9, 1970, was sentenced on each to six-to-ten-year terms in the penitentiary concurrent with each other and concurrent with a federal sentence of five years for mail fraud imposed on March 31, 1970.

CONTENTIONS RAISED ON APPEAL.

1. The indictment for conspiracy was fatally defective by failing to name an object of the conspiracy, placing defendant in peril of double

---

* Par, 16—1. "Theft. A person commits theft when he knowingly:
(a) Obtains or exerts unauthorized control over property of the owner; * * * and
(1) Intends to deprive the owner permanently of the use or benefit of the property; * * *
Penalty.
* * * A person convicted of theft of property from the person or exceeding $150 in value shall be imprisoned in the penitentiary from one to 10 years."

jeopardy, in violation of the fifth and fourteenth amendments of the United States Constitution.

2. The State failed to prove defendant guilty of theft of over $150 beyond a reasonable doubt.

3. Defendant was deprived of a fair trial and due process of law by the conduct of the judge before the jury.

4. The sentencing of defendant for conspiracy to commit theft and theft concurrently was contrary to law.

EVIDENCE.

*Donald Basore*, for the State:

He was a solicitor for Woodstock, Inc. of Chicago and an originator and sole stockholder of Woodstock, Inc. of Florida. In December, 1969, he opened a bank account for Woodstock, Inc. of Florida at the National Industrial Bank of Miami. After the name of Carmen Freda was removed from the account, he was the only one authorized to sign checks for the company. On December 16, 1969, the account had a balance of less than $2. On that same day, a check was drawn on the account for $2,500,000, payable to Jack Walsh. The check was endorsed by Jack Walsh to Chicago Title & Trust Co. for deposit to Escrow Account #325177. The signature on the check bore the name Donald Basore; however, the witness denied drawing the check. At the time the account was opened, he received 20 blank checks in a small envelope and later received a check book with an undetermined number of checks. He never met Vito Lombardi.

*Herbert Rix*, for the State:

After being granted immunity pursuant to Ill. Rev. Stat. 1969, ch. 38, par. 106—1, he testified as follows:

In June, 1968, he was bookkeeper and general manager for Jindrich Construction Company which was run mainly by Walsh with the help of Carl Verive and defendant. He was advised by Walsh that a division of the company would be established at 5538-40 W. Division Street in Chicago, called Mar-Men Construction Company. During the time he was with Mar-Men Construction Company, no construction work was performed, but in June, 1968, Walsh, Verive, defendant and the witness typed up bills for work allegedly performed by Mar-Men for Certified Grocers of Illinois. The work was actually performed and billed by Jindrich Construction Co. He knew of no Mar-Men payroll. Also, waivers of lien were prepared in the name of Mar-Men and submitted to Certified Grocers. Certified refused to pay on them because the work covered had previously been paid for to John Jindrich of Jindrich Construction Co. All liens and invoices were taken to Certified by Jindrich, Walsh or the witness.

*Gale L. Marcus,* for the State:

He is an attorney with offices in Chicago. On December 16, 1969, he accompanied defendant to the escrow department at Chicago Title & Trust Co. He received six checks from Chicago Title & Trust Co. and immediately turned two of them over to defendant. After leaving the bank, defendant asked him where the checks could be cashed. As they were passing American National Bank, he suggested to defendant that he open an account there and then cash at least a portion of the checks. One check was payable to A. J. Novelli in the amount of $25,000; the other was payable to defendant Vito Lombardi d/b/a Mar-Men Construction Company in the amount of $15,000. Defendant opened an account by depositing this latter check, and withdrew $1,000 in cash.

On September 22, 1969, defendant, Walsh and Verive met with him in his office and Walsh told him he [Walsh] owed defendant $50,000 for work defendant had done for him.

*Matthew Mazzone,* for the State:

On December 1, 1969, he accompanied defendant to Chicago Title & Trust Co. to sign as a witness to signatures of defendant and Walsh who defendant said owed him money. He signed two papers that day but did not read them. He had never done any work for Walsh. On December 8, 1969, he returned to Chicago Title with defendant and signed another document with Novelli. He did not read the document.

*Anthony J. Novelli,* for the State:

He is a real estate broker in Du Page County, Illinois. On December 8, 1969, he met Walsh, defendant, and Matthew Mazzone at Chicago Title where, in the presence of title officers, he signed a document making him the nominee on the escrow account authorizing disbursement of $25,000 to him. On December 16, 1969, defendant gave him a check drawn by Chicago Title & Trust Co. against the escrow account in the amount of $25,000 in payment for a home which defendant purchased from Novelli. Since the home cost only $20,000, he agreed to meet defendant and his wife the next day at the Addison State Bank where he deposited defendant's check and wrote a check payable to defendant for the $5,000 difference. About a week later, he received a call from the bank informing him that payment on the $25,000 check drawn by Chicago Title had been stopped and that his account was short $4,000. Title to the property was never transferred to defendant, although he lived there for a number of months, made some repairs and some payments on the mortgage until being evicted by Novelli. The Addison Bank took $2500 from his other account to cover the deficiency of $4,000 created by the failure of defendant's check to clear.

*Jack Walsh,* for the State:

On November 18, 1969, he was present at Chicago Title & Trust Co. when an escrow agreement was opened. Following the opening, he met with Joe Rocco, Verive and defendant. It was agreed that defendant would withdraw $15,000 and Verive would withdraw $20,000 from the account. Also, Mazzone was to draw out $25,000 for defendant, and another would collect $40,000 for Verive. Mar-Men was a "paper company" created to invoice for work not actually done, collect a check in payment, and cash it.

On November 25, 1969, he met with defendant, Verive, and Rocco at Chicago Title and prepared releases for various companies. The releases were presented to Chicago Title and defendant was authorized to withdraw $15,000 from the escrow account.

On December 1, 1969, he went again to Chicago Title and was told by defendant that Mazzone was coming in that day to sign for $25,000 on the escrow for work he was supposed to have done. A release was prepared for Mazzone and presented to Chicago Title. However, on December 8, 1969, Mazzone signed off the escrow and Novelli signed on.

On the morning of December 15, 1969, he met Rocco at the Howard Johnson Restaurant in Villa Park, Illinois. From there they went to Tilecrest and typed up a check for $2,500,000, payable to Chicago Title & Trust Company. The signature of Donald Basore was on the check at the time it was typed. They had the check xeroxed and then presented it to Miss Vlasek in the escrow department at Chicago Title. She checked to see if the check was good. When told a corporate resolution was necessary before the bank would accept the corporate check, they decided instead to make out a new one payable to Walsh who would then endorse it to the escrow account. The next day, while driving to Chicago Title, he was so distracted by the $2,500,000 check payable to himself that he ran broadside into a car driven by a Mr. Thompson. After Thompson was taken to a hospital in the ambulance, he went to Action Rubber Stamp Company where a stamp was made which read: "Payable upon proper endorsement, National Industrial Bank of Miami, Florida." The check was endorsed and given to Miss Vlasek at Chicago Title.

Prior to that time, on September 22, 1969, he signed a statement indicating one of his creditors in the amount of $300,000 was Waukesha Food Products Inc., a company in which his brother had an interest and by whom he was employed. He also signed on that day a statement indicating defendant was one of his creditors in the amount of $50,000, as was Max Munson in the amount of $70,000, Verive in the amount of

$50,000, Addison Bank in the amount of $15,000 and Jim Kemper in the amount of $25,000. He bought two Cadillacs and three Oldsmobiles valued at $29,000 for himself and friends. One hundred thirty-four checks were issued by Chicago Title in payments out of the escrow account.

*Caroline Vlasek,* for the State:

She had been employed by Chicago Title in the escrow department for nine years. After she received a $2,500,000 check from Walsh on December 16, 1969, she deposited the check and began preparing checks to be drawn on the escrow account. One check was issued to defendant. She did not call the National Industrial Bank of Miami to see if the $2,500,000 check was good. Normally, someone would check to see if the check was valid before disbursement. Before disbursement, Rocco told her that she could go to a local furrier, mention his name, and pick out anything she wanted as soon as the disbursements were made. She never did so. On December 19, 1969, she first learned that the $2,500,000 check had been forged.

## OPINION

First, defendant argues that the indictment for conspiracy was fatally defective for failing to name an object of the conspiracy, placing defendant in peril of double jeopardy, in violation of the 5th and 14th amendments to the United States Constitution.

■■ Count One of the indictment, which charges defendant and others with conspiracy to commit theft, sets forth 15 acts in furtherance of the conspiracy, nine of which specifically refer to Chicago Title & Trust Company. Count Five of the indictment, which charges defendant with theft, specifically refers to Chicago Title & Trust Company as the owner of the property defendant intended to take. Defendant maintains that since no victim is named in Count One, the entire indictment is defective, and he faces the threat of a second prosecution for conspiracy. The requirement that an indictment name the person injured is to provide proper identification so that a defense may be prepared, to insure that defendant will not be placed in danger of subsequent prosecution for the same offense and will not be taken by surprise at trial. (*People v. Nelson,* 17 Ill.2d 509, 162 N.E.2d 390.) When an indictment contains more than one count, the law presumes that the various counts relate to the same transaction unless the contrary appears from the indictment. (See *People v. Borrelli,* 392 Ill. 481, 489, 64 N.E.2d 719; *People v. Tinnell,* 385 Ill. 537, 53 N.E.2d 427.) Defendant cites no cases which contradict this principle. Thus, when Count Five named Chicago Title & Trust Company as the victim of the theft, in the absence of anything contrary in the indictment, it is presumed that Chicago Title was also

the intended victim in Count One which charges defendant with conspiracy to commit the theft. Since defendant was charged with only one count of conspiracy to commit theft and but one count of theft which can be presumed to have arisen out of the same transaction, it can only follow that the victim of the conspiracy was the same as the victim of the theft. With the object of the conspiracy properly established, defendant is placed in no danger of a second prosecution for the same offense.

Next, defendant argues that the State failed to prove him guilty of theft of more than $150 beyond a reasonable doubt. He maintains that there is no evidence that Chicago Title had the total amount of the checks in its account at The First National Bank of Chicago (on which bank its checks were drawn) or that any money was disbursed from its account in payment of the checks. There are two essential reasons why defendant's assertion is erroneous.

■■ First, on December 16, 1969, Miss Vlasek at Chicago Tile executed and delivered to defendant two checks drawn on the Chicago Title's escrow account at The First National Bank of Chicago. One of the checks was payable to defendant in the amount of $15,000. Defendant left Chicago Title and immediately opened an account at American National Bank by depositing the check and withdrawing from the bank $1,000 in cash. According to the statute under which defendant was charged (Ill. Rev. Stat. 1969, ch. 38, par. 16—1(a)(1)), the theft occurred at the time he exercised unlawful control over the check, that being the time he took the check from Chicago Title. Since proof of value is shown by the fair cash value at the time and place of the theft (*People v. Butman,* 357 Ill. 506, 192 N.E. 564), in the absence of anything contrary in the record, it can be assumed the check had a value to Chicago Title of $15,000 at the time it was drawn. (See *People v. Franklin,* 415 Ill. 514, 114 N.E.2d 661.) Furthermore, common sense requires us to take notice of the fact that defendant received $1,000 in cash immediately upon deposit of the check, that fact alone being prima facie evidence of value in excess of $150. See *State v. Harrison,* 347 Mo. 1230, 152 S.W.2d 161, where failure of the indictment to allege the value of the check was held not fatal to the indictment as the check was presumed to be worth its face value.

Second, American National Bank become a holder in due course of the instrument when it took the properly executed check from defendant, for value, in good faith, and without notice that there was any defense against it or claim to it by any other person. (Ill. Rev. Stat. 1969, ch. 26, par. 3—302.) Although the question is not raised, there can be no doubt concerning American National's good faith, even though they failed to

wait until the check had cleared before permitting defendant to withdraw $1,000 from the account opened at time by deposit of the $15,000 check. It is an obvious presumption that a call to Chicago Title at that time would only have confirmed issuance of the check minutes earlier and would have verified its authenticity.

■■ As a holder in due course of an instrument upon which payment was later stopped, American National Bank had the right to recover $1,000 from Chicago Title, the drawer of the instrument. (Ill. Rev. Stat. 1969, ch. 26, pars. 3—305, 3—413 and 4—403, S.H.A. Comment 8. See also *Suit & Wells Equipment Co., Inc. v. Citizens National Bank of Southern Maryland*, 263 Md. 133, 282 A.2d 109, and *Texico State Bank v. Hullinger*, 75 Ill.App.2d 212, 220 N.E.2d 248.) Thus, it is clear that on the one check alone Chicago Title's loss would have been $1,000 and thus in excess of $150.

Next, defendant argues that the conduct of the trial judge deprived defendant of a fair trial and due process of law. Specifically, he maintains that during the early stages of the trial, defendant was prejudiced when the judge addressed the jury as follows:

"The charge against Mr. Vito Lombardi, I will read to you. However, this indictment that I am going to read to you is not an exhibit or evidence. It's merely the formal charge of the State against Mr. Vito Lombardi, and it's not a conclusive presumption that he is guilty of these charges. It's incumbent upon the State of Illinois to prove that this gentleman, Vito Lombardi, was guilty of this indictment that I am to read to you, beyond a reasonable doubt."

Those counts of the indictment pertaining to defendant were then read to the jury, and the judge continued:

"Let me admonish you again, ladies and gentlemen of the jury, an indictment is not evidence, and it is not proof. The burden is upon the State to prove beyond a reasonable doubt. It's merely a charge.

＊　＊　＊

The indictment in this case is not to be considered as any evidence or presumption of guilt against the defendant. It is a mere formal charge necessary to place the defendant upon trial. The defendant under the law is presumed to be innocent of the charge in the indictment, and this presumption remains throughout the trial. And the presumption is in favor of this defendant. Until you have been satisfied by the evidence in the case beyond all reasonable doubt of the guilt of the defendant and the burden of proving the guilt of the defendant beyond all reasonable doubt

is on the State, and the law does not require the defendant to prove his innocence."

Defendant contends that when the judge initially advised the jury that the indictment was "merely the formal charge  *  *  *  and it's not a conclusive presumption that he is guilty of these charges," he committed reversible error by subtly informing the jury that defendant was presumed guilty although such presumption could be rebutted. In so arguing, defendant overlooks the remainder of the judge's comments to the jury which we find clearly dispel any possible misapprehension the jury may have had about the presumption of guilt. Although the judge may inadvertently have referred to the indictment as not being a "conclusive presumption," his preliminary advice to the jury, like the formal instructions at the conclusion of the evidence, must be considered as a whole, and we must note that this clause was phrased in the negative and was followed by the numerous statements quoted above which properly advised the jury of an indictment's function and that defendant was presumed innocent, which presumption of innocence would remain with him throughout the trial.

Furthermore, at the close of the case, the jury was instructed that the indictment "is not any evidence against the defendant and does not create any inference of guilt." I.P.I. Criminal #2.02. Also I.P.I. Criminal #2.03 was given which reads:

> "The defendant is presumed to be innocent of the charge against him. This presumption remains with him throughout every stage of the trial and during your deliberations on the verdict, and is not overcome unless from all the evidence in the case you are convinced beyond a reasonable doubt that the defendant is guilty.
>
> The State has the burden of proving the guilt of the defendant beyond a reasonable doubt, and this burden remains on the State throughout the case. The defendant is not required to prove his innocence."

Taken in conjunction with the earlier statements by the judge, we find no prejudice to defendant's right to a fair trial. A defendant is given the right to a fair trial, not one free from all error. *People v. Garner,* 91 Ill.App.2d 7, 18, 234 N.E.2d 39.

The third point urged by defendant is alleged to have occurred at the conclusion of the State's direct examination of Herbert Rix, a State's witness. At that time, the court asked:

> "Mr. Georges [defense counsel], do you wish to proceed with this witness on cross examination or do you want to reserve the

right to examine the testimony before the Grand Jury if this witness has testified before the Grand Jury?"

■■ Counsel immediately moved for a mistrial, which motion was denied. Defendant argued then and reasserts now that the judge's question forced counsel either to impeach the witness with the grand jury minutes or explain why he did not. If no such cross-examination were made, the effect, he argues, would be to enhance the credibility of the witness. In *People v. Lowe*, 84 Ill.App.2d 435, 228 N.E.2d 563, the only case cited by defendant, the court reversed the conviction where the state's attorney, in the presence of the jury, turned over to defense counsel documents purporting to be testimony of the complaining witness before the grand jury and a document purporting to be a police report of the witness' statement, then stated in closing argument that the defense had failed to impeach those statements. Here, no documents were presented to counsel and no further mention was made of impeachment of the witness or the lack of it. Furthermore, the judge's statement did not affirmatively establish that Rix had in fact testified before the grand jury, but stated only that defense counsel could have time to review the grand jury testimony if, indeed, such testimony had been given. Thus, the case is distinguishable on its facts and it cannot be said here that one isolated and somewhat ambiguous statement by the judge prejudiced in any substantial way defendant's right to a fair trial. *People v. Nilsson*, 44 Ill.2d 244, 248, 255 N.E.2d 432, *cert. denied* 398 U.S. 954, 90 S. Ct. 1881.

■■ Finally, the State concedes that although defendant was properly convicted of theft and conspiracy to commit theft, defendant should have been sentenced for only the substantive offense of theft. We agree. (*People v. Radford*, 87 Ill.App.2d 308, 232 N.E.2d 100.) In addition, pursuant to motion by defendant, defendant's sentence for theft is modified by reducing the minimum to three years and four months, in accordance with the currently effective Unified Code of Corrections. (Ill. Rev. Stat., 1972 Supp., ch. 38, par. 1005—8—1(c)(4).) As modified, defendant's conviction for theft is affirmed, and his sentence under the conspiracy charge is vacated.

Sentences vacated in part, modified in part, and affirmed as modified.

DRUCKER, P. J., and LORENZ, J., concur.