CHICAGO TITLE AND TRUST COMPANY, Plaintiff-Appellee, Appellant and Cross-Appellant, *v.* JACK WALSH *et al.,* Defendants-Appellants, Appellees and Cross-Appellees.—GALE L. MARCUS *et al.,* Plaintiffs-Appellants, Appellees and Cross-Appellees, *v.* CHICAGO TITLE AND TRUST COMPANY, Defendant-Appellee, Appellant and Cross-Appellant.

(No. 59504;

First District (3rd Division)—November 20, 1975.

460

Arnstein, Gluck, Weitzenfeld & Minow, Louis Lehr, and Gale Marcus, all of Chicago, for appellants.

Richard S. Wisner, of Gilmartin, Wisner & Hallenbeck, Dom J. Rizzi, and Jack R. Pine, all of Chicago, for appellees.

Mr. JUSTICE DEMPSEY delivered the opinion of the court:

Chicago Title and Trust Company filed an action to prohibit the negotiation of drafts it issued through an escrow to numerous creditors of Jack Walsh, who founded the escrow with a forged certified check in the sum of $2,500,000. Four of the drafts had been issued on behalf of or to Gale Marcus, Max Munson and Carl Verive. The title company also asked rescission of the escrow and return of its drafts.

Marcus, Munson and Verive filed a declaratory judgment action seeking payment of the drafts and of damages sustained in reliance on them. They alleged the breach by Chicago Title of express, implied, or constructive contracts, the breach of its duty as escrowee, conversion of documents by wrongfully releasing them to Walsh, negligence and willful, wanton, reckless conduct.

The two cases were consolidated. Counsel for the plaintiffs in the declaratory judgment action withdrew as attorneys for Verive, who apparently had fled the jurisdiction, and his interest in the cause was dismissed for want of prosecution. Munson died before trial and his estate was substituted as a party. The trial court ordered rescission of the escrow and the return of the drafts, but entered judgment against Chicago Title for damages sustained by Marcus and Munson in reliance on the dishonored drafts. Marcus and Munson filed a post-trial motion and the court amended its findings to state that a fraud was perpetrated by Jack Walsh and to increase the damages to Marcus by $2,300 for attorney's fees incurred during the trial.

Three issues are raised on appeal: (1) whether the court overreached its equitable powers by granting rescission of the escrow; (2) whether Marcus and Munson may enforce payment of the checks issued by Chicago Title, and (3) whether the damages awarded Marcus were properly computed.

The factual background of this case has been substantially de-

lineated in civil and criminal litigation which sprang from these events. (See *Munson v. American National Bank & Trust Co.*, 484 F.2d 620 (7th Cir. 1973), and *People v. Lombardi* (1973), 13 Ill.App.3d 754, 301 N.E.2d 70.) An escrow was opened at Chicago Title on November 18, 1969, by Paul Rudnick and Joseph Caracci, Chicago attorneys. Rudnick acted on behalf of Certified Grocers of Illinois, Inc., Caracci for Roger Walsh (the brother and business associate of Jack Walsh). For its services as escrowee Chicago Title received a $5,000 fee. The agreement, with one notable exception, was in the usual form which provided for the interchange and delivery of documents, deposited or to be deposited, upon the performance of stipulated conditions. The exception, which Caroline Vlasek, the officer assigned to the escrow, acknowledged in testimony to be unusual, provided that the agreement was not to be amended unless Rudnick executed the amendment in person and was known and identified by the escrowee. Despite this, Chicago Title on December 1, 1969, accepted an amendment signed only by Caracci which authorized the escrowee to accept directions from Jack Walsh as to disbursements. This opened the door for Walsh to bring into the escrow more of his creditors, among them Marcus and Munson. By supplemental instructions he then arranged to deposit $2,500,000 for disbursement to his creditors and those of his brother.

Rudnick, and another attorney who made a special trip to her office for the purpose, warned Vlasek that Jack Walsh was dishonest and could not be trusted. Rudnick even expressed a fear that his own name might be forged by another party to the escrow. Vlasek related these warnings to her superiors and suggested that the escrow be terminated, if at all possible. On the afternoon of December 15, 1969, Walsh brought her a photocopy of a check for $2,500,000 drawn by Woodstock, Inc., of Florida on the National Industrial Bank of Miami and payable to Chicago Title. He told her the original was still in Florida and asked if the check would be acceptable. Vlasek consulted with a senior escrow officer and informed Walsh that the check had to be certified and the corporation drawing it would either have to pass a resolution of authorization or make it payable to Walsh and he could endorse it to Chicago Title. Early the next morning, Walsh called her to say that another check was being flown in from Florida. She agreed to meet him outside of the Chicago Title offices and at 11 a.m. they met in a first-floor arcade connecting the Chicago Title and Trust Company building and the American National Bank building, where he gave her a check, purportedly certified by the Miami bank, payable to himself and endorsed by him to the title company. Vlasek took the check to the title company bookkeeping department. She gave instructions to deposit the check immediately, saying

that she intended to disburse payments from the escrow that same day. She then drew 134 checks against Chicago Title's account at the First National Bank of Chicago, and began to pay them out to the various depositors to the escrow. She also passed releases and other documents out of the escrow to Walsh.

Among the payees was Attorney Gale Marcus, who received one draft for $25,000 payable to himself, and another in the amount of $80,000 as agent and attorney for Munson and the Munson Mortgage and Investment Corporation. These sums had been included in a confession judgment of $573,980.15, obtained earlier on a promissory note prepared by Marcus and executed by Walsh. Munson was trustee of a number of creditors whose claims were consolidated in the note and judgment. Some of these claims were apparently spurious (see *People v. Lombardi*), but there was no evidence that this was known to Marcus or Munson. The $25,000 payment to Marcus represented attorney's fees for the debt consolidation and judgment. Munson's $80,000 represented a compromise of a $130,000 debt due him from Walsh. Marcus had deposited in the escrow, pursuant to an amendatory instruction prepared by Vlasek at his request, a general release running from Munson to Walsh, an unrecorded satisfaction of the judgment note and two quitclaim deeds to property which was the subject of the original escrow. Walsh had some time earlier conveyed the property to Munson by deeds which turned out to be forged.

Marcus received his drafts from Miss Vlasek on December 16. At the same time he gave her certain NSF checks, defaulted notes and a check forged by Walsh for $6,000. These instruments evidenced Munson's claims against Walsh totalling approximately $115,000. Marcus also gave Vlasek Walsh's affidavit of interest in the property which was the subject of the escrow. All the instruments were turned over to Walsh when he collected the other documents in the escrow.

On the following day, Marcus and Munson negotiated the two Chicago Title drafts at the American National Bank. Marcus deposited his $25,000 draft in his personal checking account. Munson exchanged his $80,000 draft for three cashier's checks and $1,000 in cash. Two more days passed before the title company learned that the Walsh check was a forgery and stopped payment on its own drafts. American National then debited Marcus' account for $25,000 and stopped payment on two of the three cashier's checks issued to Munson, actions which were subsequently upheld in the Federal court. *Munson v. American National Bank & Trust Co.*

Marcus and the estate of Munson claim that by granting rescission of the escrow the court abused its discretion, first, because Chicago Title

negligently and even recklessly acted under a unilateral mistake when it issued its drafts; second, because they, as defendants in the rescission action cannot be placed in status quo. Chicago Title rejoins that the parties were mutually mistaken in their belief the escrow had been funded and that its alleged negligence in failing to learn of the forgery before issuing its drafts is irrelevant as a matter of law to the rescission issue.

We believe the question of negligence is relevant. Vlasek testified that the procedures used to process Walsh's check were customary in the escrow department, where the receipt of very substantial sums is a routine matter. (But compare her testimony in *People v. Lombardi*, where she said that normally an inquiry would be made to see if a check was valid before disbursement.) Even if the procedure used in this case is routine in the escrow department of Chicago Title, the present transaction was, at best, conducted with surprising carelessness. An important and distinctive condition in the escrow was ignored. Repeated warning signals that this was not a routine transaction were given little heed. Vlasek and, through her, her superiors were informed of Walsh's reputation and record. In spite of this she followed his directions, accommodated him by meeting him away from her office, accepted his $2,500,000 check without question and hastily processed the escrow. With this background, and the fact that a debacle of this magnitude might have been averted by a simple telephone call to the bank that purportedly certified the check, the only conclusion possible is that there was gross negligence.

Marcus and his codefendants in the rescission action cite *People ex rel. Department of Public Works & Buildings v. South East National Bank* (1971), 131 Ill.App.2d 238, 266 N.E.2d 778, as authority for the conditions generally required for rescission due to unilateral mistake, namely, that the mistake was related to a material feature of the contract; that it occurred notwithstanding the exercise of reasonable care; that it was of such grave consequence that enforcement of the contract would be unconscionable, and that the other party can be placed in status quo.

On the other hand, Chicago Title cites cases which have taken a much different view toward persons in its position. It has been held that money paid under a mistake of fact, which would not have been paid had the facts been known to the payors, may be recovered. The fact that the person to whom the money was paid was not guilty of deceit or unfairness, but acted in good faith, does not preclude recovery, nor does the negligence of the payor. (*Salvati v. Streator Township High School District Number 40* (1964), 51 Ill.App.2d 1, 200 N.E.2d 122; *Stifel, Nicolaus & Co. v. Coloia* (1971), 2 Ill.App.3d 224, 276 N.E.2d 408.) But that general rule does not apply where the payment has caused a change

in the position of the payee so that it would be unjust to require him to refund, as where he releases security not readily recoverable. (*Baxter v. Continental Illinois National Bank & Trust Co.* (1940), 304 Ill.App. 117, 26 N.E.2d 179.) Although Chicago Title replevined Munson's release of Walsh on the confession judgment and the other documents which were officially a part of the escrow, Marcus testified that other evidences of Walsh's debts and peculations and the affidavit of his interest in the property in escrow were destroyed. Vlasek first denied, then admitted, that Marcus did provide her with additional papers for delivery to Walsh when she paid out the drafts.

■■ In our opinion the grant of rescission was an abuse of the court's discretion. However, our determination is not founded upon the cases cited by either party, since neither line of authority directly applies to the series of transactions from which this case arose. *South East National Bank* was concerned with the right to rescission of one whose erroneous bid on a public contract had been accepted. (See Annot., 52 A.L.R.2d 792 (1957).) *Salvati* and *Coloia*, too, are inapposite. Even if we did not find a release of unrecoverable security under the *Baxter* exception, the payment recovery cases do not apply. A payor may recover payments made upon a mistaken belief in the existence of a contract between him and the payee; as to the extent of his duty in discharge thereof; as to the quantity of goods for which he had paid money; or that the person for whom he pays owed a duty to the payee. (Restatement of Restitution §§ 15, 20, 21, 23 (1937).) But so far as appears from this record, the claims of Marcus and Munson were genuine. They took payment in exchange for the discharge of a legitimate debt, without misrepresentation by them and without notice to them of Walsh's fraud. This was a bona fide discharge for value.

The Restatement of the Law of Restitution provides, in section 14:

"§ 14. DISCHARGE FOR VALUE

(1) A creditor of another or one having a lien on another's property who has received from a third person any benefit in discharge of the debt or lien, is under no duty to make restitution therefor, although the discharge was given by mistake of the transferor as to his interests or duties, if the transferee made no misrepresentation and did not have notice of the transferor's mistake.

\* \* \*

*Comment on Subsection* (1):

\* \* \*

b. Where a third person, in the mistaken belief that he has a duty to pay a debt owed another \* \* \*, pays money or trans-

fers some other benefit in whole or partial discharge of the debt or lien, even though the creditor or lien holder believes that the duty or interest exists, the bargain as to payment is made with reference to the existence of the debt or lien and not with reference to the duty or interest of the transferor, in the absence of an agreement that the payment or other transfer is conditioned thereon. Hence it would be inequitable to require restitution from the transferee since, in the surrender of the debt or lien, he has given value and acquired title to the money or other thing given in payment. * * *

The rule stated in this Subsection applies * * * where a person pays the debt of another mistakenly believing that the other is solvent or has put the payor in funds * * *."

(See also Restatement of Restitution § 17, Comment b (Creditor Beneficiary) (1937).) The rule is the same when payment is made in commercial paper (*Winslow v. Anderson* (1917), 78 N.H. 478, 102 A. 310; 11 Am.Jur.2d *Bills and Notes* § 992 (1963)) and it applies equally when the mistake of the transferor was induced by the fraud of the person whose debt he discharges. (*Benjamin v. Welda State Bank* (1916), 98 Kan. 361, 158 P. 65.) It is,

"* * * a limitation upon the principal that a person who has been wrongly deprived of his things is entitled to restitution. This limitation involves no moral issue, since it merely creates convenient rules for determining which of two innocent persons should bear a loss which must be borne by someone. * * * [I]t applies also where the subject matter is received directly from the transferor at the direction of the other party to the transaction." Restatement of Restitution § 13, Comment a (1937).

■■■ That Chicago Title served as escrowee in the transaction does not affect the rights of the parties before us now, since the escrow was completed, according to revised instructions and to the satisfaction of the principals. Marcus and Munson received payment in full while Walsh took delivery of his documents. Fraud was committed, but as the trial court found, it was perpetrated by Walsh on Chicago Title. The depositary of an escrow is a special agent, whose powers are limited to the conditions of the deposit. (*Ortman v. Kane* (1945), 389 Ill. 613, 60 N.E. 2d 93.) Taking Walsh's check in exchange for others that were issued against its own credit, Chicago Title acted on its own, outside the terms of the original instructions or amendments to the escrow, which spoke of the distributions only in terms of dollar amounts. So, with respect to its drafts, Chicago Title stood in the position of any person who, erroneously

believing that he has been placed in funds, discharges the obligation of another to a third person.

Marcus and Munson's estate claim that the court committed further error by failing to order that Chicago Title honor the instruments. They contend that they were holders in due course of the drafts within the terms of the Commercial Code. Chicago Title counters with the argument that Munson was not even a holder, that the payees were not holders in due course, and that, even if they were, they remain subject to the personal defense of want of consideration because of their involvement in the underlying transaction.

■■ The Uniform Commercial Code defines a holder as "a person who is in possession of * * * an instrument * * * drawn [or] issued or indorsed to him or to his order or to bearer or in blank." (Ill. Rev. Stat. 1967, ch. 26, par. 1—201(20).) Chicago Title urges that since Munson negotiated the $80,000 draft to the American National Bank and neither he nor the payee Marcus possessed the draft at the time of trial, neither one can claim the status of holder of that instrument. However, the only testimony on this subject was that when payment had been stopped on the drafts they were returned to the American National Bank, which was acting as the agent of Marcus and Munson for collection of the drafts. (Ill. Rev. Stat. 1967, ch. 26, par. 4—201.) But, protected by a written guarantee of indemnity from Chicago Title, American National did not return the $80,000 item to them, passing it instead to the title company. The Code has anticipated this situation, and provides for it as follows:

> "The owner of an instrument which is lost, whether by destruction, theft or otherwise, may maintain an action in his own name and recover from any party liable thereon upon due proof of his ownership, the facts which prevent his production of the instrument and its terms. The court may require security indemnifying the defendant against loss by reason of further claims on the instrument." (Ill. Rev. Stat. 1967, ch. 26, par. 3—804.)

Under the circumstances we consider the title company's argument specious and regard Munson's estate as the holder of the instrument sued on. From the record, this would seem to accord with the view taken by the trial court.

■■ We find, too, that Marcus and Munson were holders in due course of the drafts they received. Under the article of the Commercial Code governing negotiable instruments (Ill. Rev. Stat. 1967, ch. 26, par. 3—101 et seq.), a holder in due course is "a holder who takes the instrument (a) for value; and (b) in good faith; and (c) without notice that it is overdue or has been dishonored or of any defense against or claim

to it on the part of any person." (Section 3—302(1).) Under section 3—303, a holder takes an instrument for value "(a) to the extent that the agreed consideration has been performed * * *; or (b) when he takes the instrument in payment of * * * an antecedent claim against any person whether or not the claim is due; or (c) when he * * * makes an irrevocable commitment to a third person." Marcus and Munson gave value under any of these definitions. The contrary position of Chicago Title is premised upon the notion that the fraud practiced upon it by Walsh nullified a condition precedent to the escrow—that it be funded—so that the escrow was void, the consideration was not performed and the delivery of the documents was ineffective to discharge the antecedent claim against Walsh.

We do not think that the Marcus-Munson documents were delivered from the escrow to Walsh prior to the occurrence of any condition precedent. The simple fact is that the escrow was completed. Marcus and Munson received their agreed compensation from a reliable third-party drawer, and the documents of release were in turn delivered to Walsh. The title company has cited a broad array of authorities for the proposition that delivery to or from an escrowee is conditional and voidable if the conditions of delivery are not fulfilled. (See e.g., Restatement (Second) of Agency § 14D (1958); 28 Am.Jur.2d *Escrow* § 21 (1966); 30A C.J.S. *Escrows* § 11 (1965); 17 Ill. L. & Pr. *Escrows* § 4 (1956); *Chicago & Great Western Railroad Land Co. v. Peck* (1885), 112 Ill. 408.) However, none of the cited authorities, nor any that we have found, dealt with a situation such as this, where the deliveries between the principals took place exactly as agreed. True, the buyer of the deposited documents obtained his purchase drafts by a fraud on the escrow holder. But, as we explained in our treatment of the rescission issue, Chicago Title was performing a dual function, as escrow holder and as one who gave its drafts in exchange for a forged cashier's check, delivering them to bona fide creditors of a third party. Its role as underwriter for Walsh had no necessary or contractual connection to the underlying agreement between the principals or to any escrow-related negotiations between itself and Marcus and Munson.

Chicago Title contends that the payees' involvement in the web of events that preceded their receipt of the drafts shows that they did not take the drafts with the "white heart" necessary to a holder in due course. (*Financial Credit Corp. v. Williams* (1967), 246 Md. 575, 229 A.2d 712; *General Investment Corp. v. Angellini* (1971), 58 N.J. 396, 278 A.2d 193.) It does appear that some who purported to be creditors in the escrow were acting in league with Walsh in a plan to defraud Chicago Title, for which they were subsequently prosecuted. (*People v. Lom-*

*bardi.*) But there is no evidence to indicate that Marcus and Munson were not bona fide creditors or that they ought to have been suspicious of the Chicago Title drafts. One reason for using the escrow was to protect against the untrustworthiness of Walsh. His bona fide creditors were entitled to believe that commercial paper issuing from Chicago Title would be as sound as its face would indicate.

■■ A purchaser has notice of a defense to an instrument when he has actual knowledge of it or when, from all the facts and circumstances known to him when he takes it, he has reason to know it exists. (Ill. Rev. Stat. 1967, ch. 26, pars. 1—201(25); 3—304.) But, if anything, the circumstances under which they took these instruments ought to have reassured Marcus and Munson of their validity. They had no duty of active inquiry (*Peterson v. Rosin* (1965), 62 Ill.App.2d 340, 211 N.E.2d 3), and notice acquired subsequent to the time of taking did not impair their status as holders in due course. *Crest Finance Co. v. First State Bank* (1967), 37 Ill.2d 243, 226 N.E.2d 369.

■■ Chicago Title next contends that, even if Marcus and Munson were holders in due course, they dealt with the title company for the instruments and thus deprived themselves of protection against personal defenses to the instruments, and the drafts are therefore unenforceable for want of consideration. The company relies on section 3—305 of the Code, which provides: "To the extent that a holder is a holder in due course he takes the instrument free from * * * (2) all defenses of any party to the instrument with whom the holder has not dealt * * *."

The official comment to section 3—305 offers no explanation of the scope of the restriction imposed on those who have "dealt" with parties to the instrument. However, it is generally supposed that this was inserted to limit the broad statement in section 3—302(2) that "A payee may be a holder in due course." Presumably the restriction discriminates against those parties who are holders in due course because they fulfill all the requisites of section 3—302(1), but who are so involved with the disputed transaction that they should not be free from defenses. (See Comment, *The Concept of Holder in Due Course in Article III of the Uniform Commercial Code*, 68 Col. L. Rev. 1573 (1968).) The limiting term is a vague one, but guidance in its application against payees may be had by reference to the examples supplied in the official comment to section 3—302 (Ill. Ann. Stat. ch. 26, § 3—302, U.C.C. Comment 2, at 142 (Smith-Hurd 1963)), which states:

> "The position here taken is that the payee may become a holder in due course * * * whether he takes the instrument by purchase from a third person or directly from the obligor. * * *

In the following cases, among other, the payee is a holder in due course:

* * *

d. A defrauds the maker into signing an instrument payable to P. P pays A for it in good faith and without notice, and the maker delivers the instrument directly to P."

It seems reasonable to accept the Code illustrations of payees who are holders in due course as illustrations, too, of payees who are deemed not to have dealt with a party to the instrument within the meaning of section 3—305. If not, then to supply the examples would be an empty gesture and, worse, a source of confusion. Example d. corresponds well with the facts of this case, except that here Chicago Title as drawer of the drafts also performed as escrowee. This exercise of dual functions also represents the only significant distinguishing feature between this case and *Crest Finance Co. v. First State Bank*, where a depositor of shares of stock in escrow was paid with cashier's checks in his name, obtained fraudulently from the bank by the stock purchaser. The seller-payee was a holder in due course and the bank was required to honor the checks, despite the fraud of the buyer. In the capacity of escrowee, the title company did negotiate with Marcus and Munson, but those dealings concerned only the timing of the execution of the underlying agreement by which Walsh would discharge his debts. "No one has suggested that being a party to the underlying transaction bars the holder from being one in due course * * *." (*Saale v. Interstate Steel Co.* (1966), 27 App.Div.2d 1, 4, 275 N.Y.S.2d 532, 535, *aff'd*, 19 N.Y.2d 933, 228 N.E.2d 397, 281 N.Y.S.2d 340 (1967). See also *Drumm Construction Co. v. Forbes* (1922), 305 Ill. 303, 137 N.E. 225.) Marcus and Munson played no part in the disbursing arrangement reached between Walsh and Vlasek, by which he tendered a purported lump sum to secure the issuance of genuine and commercially acceptable drafts drawn against the account and credit of the title company. In order to have dealt with Chicago Title within the meaning of section 3—305, we think Marcus and Munson would have had to participate in the immediate transaction by which the company gave out its drafts, that is, the exchange of the forged cashier's check for the drafts. Since they did not, we hold that when the drafts were delivered to these payees, holders in due course, the drafts were a part of the credit structure and the payees were entitled to rely upon them as cash. The title company, in turn, was obligated to honor its engagement to pay. Ill. Rev. Stat. 1967, ch. 26, pars. 3—413(2); 3—305.

Our decision is consistent with such authority as we find on the subject

in other Code jurisdictions. (*Saale v. Interstate Steel Co.; Sani-serv Division of Burger Chef Systems, Inc. v. Southern Bank* (Fla.App. 1970), 244 So.2d 509.) Some cases contain broad, seemingly contradictory statements, but are reconcilable on their facts. In *Wagner v. Bonucelli* (Fla. App. 1970), 239 So.2d 619, 620, it was said that, "As between the original maker and original payee there can be evidence produced outside the four corners of the instrument which should be considered in support of the defenses of lack of consideration, release, waiver and estoppel." But the maker and payee, besides being foster-father and son, were also the principals—borrower and lender—in the underlying transaction. In *First National Bank v. Brown* (Iowa 1970), 181 N.W.2d 178, 182, the court stated that since the first holder of a note had not transferred it, "* * * no effect is given its negotiable character * * *." But in that case, as in *Wagner*, the holder had taken the note for his loan to the maker. The title company has cited *Brotherton v. McWaters* (Okla. 1968), 438 P.2d 1, but there holders in due course of an endorsed check, taken for their services to the endorser, were held amenable to personal defenses in their action against the endorser after the check was dishonored. *Wilmington Trust Co. v. Delaware Auto Sales, Inc.* (Del. 1970), 271 A.2d 41, also relied upon by Chicago Title, decided only that when an innocent holder of a dishonored check negotiated it for a bank cashier's check payable to himself, he was subject to the defense of want of consideration in his action on the second instrument. The facts paralleled those presented in *Munson v. American National Bank*, but the case says nothing pertinent to this appeal.

The trial court ordered Chicago Title to pay damages of $15,359.40 to Marcus and $10,412.50 to Munson's estate. The entire award to Munson was for attorney fees, but was reduced by $8,104.77, that being the amount of one cashier's check honored by American National Bank, for which it had been indemnified by the title company. Of Marcus' damages, $2,300 represented attorney fees. Chicago Title contends that so much of the awards as was allocated for attorney fees was erroneous, and that the balance awarded to Marcus—$13,059.40—was excessive.

■■ The damage awards appear to have been allowed as a condition to the rescission of the escrow. Finding number six of the court's final order stated that Chicago Title was entitled to rescission "upon the return" to Marcus and Munson of their documents of release and upon payment of the damages. We have, however, decided that the escrow ought not have been rescinded. Since the premise of the court's award no longer obtains, that part of the judgment, too, must be reversed. However, in order to guide the court in the reassessment of damages upon

remandment, we will briefly comment upon some of the title company's contentions.

██ In the absence of a statute or some agreement or stipulation specially authorizing them, attorney fees and the ordinary expenses and burdens of litigation are not allowable, either in law or in equity. (*Ritter v. Ritter* (1943), 381 Ill. 549, 46 N.E.2d 41; *House of Vision, Inc. v. Hiyane* (1969), 42 Ill.2d 45, 245 N.E.2d 468; *Stirs, Inc. v. City of Chicago* (1974), 24 Ill.App.3d 118, 320 N.E.2d 216.) The fees awarded in this case were not predicated on either statute or agreement. Marcus suggests that they may have been granted in connection with his and Munson's count for punitive damages. When fixing an award for exemplary damages, the court may properly consider as one element the amount of the plaintiff's attorney fees. (*Skelly Oil Co. v. Universal Oil Products Co.* (1949), 338 Ill.App. 79, 86 N.E.2d 875.) But the court gave no clue in its order that these awards were intended to serve as punitive damages, and they were not, in any event, accompanied by the requisite finding of aggravated circumstances, such as willfulness, wantonness, malice or oppression. (*Eshelman v. Rawalt* (1921), 298 Ill. 192, 131 N.E. 675.) The awards of attorney fees were erroneous.

██ Regarding the compensatory damages to Marcus, the title company claims that all but $2,340.19 was based upon remote and speculative items, while Marcus insists that he is entitled to an additional $5,220.31. Since we cannot determine from the record the method by which these were computed, we can only comment generally upon the allegations and evidence. While a plaintiff is entitled to recover all damages which naturally flow from the commission of a tort, he must prove them with reasonable certainty. The damage must be the natural result of the wrong inflicted, it must be real, and it must not be speculative or probable. (*Bimba Mfg. Co. v. Starz Cylinder Co.* (1969), 119 Ill.App. 2d 251, 256 N.E.2d 357; *Looby v. Buck* (1959), 20 Ill.App.2d 156, 155 N.E.2d 641.) The largest single element of alleged damage to Marcus consisted of some $15,000 in checks drawn by him between December 16 and December 30, 1969. But he learned that payment had been stopped on the Chicago Title drafts on December 21. At that time he had issued only $5,865.16 in obligations from his account. Moreover, with one or two exceptions, such as a charitable contribution of $100, these were payments in discharge of business expenses (phone service, law publishers, professional association fees) or personal expenses (doctor, hospital, restaurant, insurance). The largest single item, for $2,807.61, was payable to the Internal Revenue Service, for income tax liability dating from a previous year. With the exception of the interest on a

$10,000 loan which Marcus took out to cover his checks, Marcus would have to establish that these expenditures, which were for the most part due in any event, were made in reliance upon the Chicago Title draft.

The $10,000 loan was paid in February 1970, yet Marcus alleged several thousand dollars in damage for interest on several other loans taken out over the following year, purportedly to meet commitments made during the four days he believed he held the $25,000. Among the commitments was a $4,500 mink coat for his wife. Also included were some investment commitments. It seems that he might have mitigated any reliance element in these obligations by returning the coat and by attempting to revoke his unwritten business agreements. It would also be Marcus' burden to prove that the claimed penalty of $720.66 plus interest of $748.55 on his income tax liability for the following year, 1970, resulted proximately from his temporary reverses of 1969. The size of his tax liability in that year—more than $12,000—suggests that unrelated obligations might have figured in his inability to set aside sufficient income for his estimated tax payments.

The judgment of the Circuit Court is reversed, and the cause is remanded for proceedings not inconsistent with this opinion.

Reversed and remanded.

McNAMARA and MEJDA, JJ., concur.